SHIRLEY S. ABRAHAMSON, J.
¶ 342. (concurring in part, dissenting in part).
Nos. 2014AP296-OA: Original Action: Two Unnamed Petitioners v. Peterson
2014AP417-421-W: Supervisory Writ & Appeal: Schmitz v. Peterson
2013AP2504-2508-W: Supervisory Writ & Review: Three Unnamed Petitioners v. Peterson
¶ 343. The majority opinion decides three different cases related to John Doe proceedings underway in five different counties. These John Doe proceedings share a common objective: To investigate potential violations of Wisconsin's campaign finance law, Wis. Stat. ch. 11 (2011-12).[1] The proceedings also share a single John Doe judge, who was assigned to the proceedings in all five counties, and a single Special Prosecutor, who was appointed by the John Doe judge to conduct the investigation in all five counties.[2]
*181 ¶ 344. The John Doe cases were consolidated for purposes of briefing and oral argument, but not for any other purpose.[3] Briefs have been filed. The court, over dissent, canceled oral argument.[4]
¶ 345. The majority opinion and concurrences in these John Doe cases resolve issues raised by the parties; issues raised by the court in its December 16, 2014, order (attached hereto as Exhibit A); and new issues not previously raised by the parties or the court. These writings have far-reaching implications, not just for the John Doe investigation underlying the instant cases but also for this state's electoral process, future John Doe proceedings, and criminal proceedings generally.
¶ 346. I begin by addressing the majority opinion.
¶ 347. Lest the length, convoluted analysis, and overblown rhetoric of the majority opinion obscure its effect, let me state clearly: The majority opinion adopts an unprecedented and faulty interpretation of Wisconsin's campaign finance law and of the First Amendment. In doing so, the majority opinion delivers a significant blow to Wisconsin's campaign finance law and to its paramount objectives of "stimulating vigorous campaigns on a fair and equal basis" and providing for "a better informed electorate."[5]
*182 ¶ 348. Disregarding the statutory text that the majority opinion professes to interpret, the majority opinion takes the absolutist position that Chapter 11 does not reach any issue advocacy and that any manner of government regulation of any issue advocacy contravenes the First Amendment.[6] Thus, within the realm of issue advocacy, the majority opinion's theme is "Anything Goes."[7]
¶ 349. But it is not just the letter of Wisconsin's campaign finance law that the majority opinion disregards. It also disregards the spirit of the law.[8]
¶ 350. The legislative declaration of policy set forth at Wis. Stat. § 11.001(1) provides that "[w]hen the true source of support or extent of support [for a candidate] is not fully disclosed, or when a candidate becomes overly dependent upon large private contributors, the democratic process is subjected to potential corrupting influence." To prevent such corrupting influence, the legislature has declared that "the state has *183 a compelling interest in designing a system for fully disclosing contributions and disbursements made on behalf of every candidate for public office. . . ."[9]
¶ 351. Despite these clear statements of legislative policy, the majority opinion holds that disbursements made on behalf of candidates need not be fully disclosed — indeed, they need not be disclosed at all — if such disbursements are made for issue advocacy.[10]
¶ 352. In taking this absolutist position, the majority opinion attempts to terminate the John Doe investigation underlying the instant cases in its infancy. The majority opinion's unsupported, ultra vires declaration that its resolution of the original action brought by two of the eight Unnamed Movants "ends the John Doe investigation" contradicts other aspects of the majority opinion and reveals the majority opinion's blatant attempt to reach its desired result by whatever means necessary.[11]
*184 ¶ 353. According to the United States Court of Appeals for the Seventh Circuit, no opinion of the United States Supreme Court or a federal court of appeals has established that the First Amendment forbids regulation of, or inquiry into, coordination between a candidate's campaign committee and issue advocacy groups.[12] In repeatedly and single-mindedly declaring a rule that federal case law has declined to adopt, the majority opinion betrays its result-oriented, agenda-driven approach.
¶ 354. If the majority opinion succeeds in terminating the John Doe investigation, the majority opinion will deny the people of this state the opportunity to determine once and for all whether the targets of the John Doe investigation are guilty of systematically violating Wisconsin's campaign finance law through undisclosed campaign coordination.
¶ 355. I write separately to provide an objective, precedent-based analysis of the statutory and constitutional issues presented in the John Doe cases.
*185 ¶ 356. I note at the outset that the statutory and constitutional issues presented in the John Doe cases do not include whether the subpoenas and search warrants issued by the John Doe judge were unconstitutionally overbroad or executed in an unconstitutional manner.
¶ 357. The parties did not raise these issues and this court did not seek comment on them.[13] These issues have not been briefed by some parties and have not been fully briefed by others. Nevertheless, these issues are discussed at length in the separate writings by Justices Prosser and Ziegler.
¶ 358. Justice Prosser declares that he is writing on Issue 14. Issue 14 addresses whether there was probable cause for the search warrants issued in the John Doe proceedings. Issue 14 does not concern the breadth or execution of the search warrants, does not concern subpoenas, and is limited to two Unnamed Movants (not five individuals, as Justice Prosser states in ¶ 201 of his concurrence). Issue 14 asks the parties to address the following issue:
Whether the affidavits underlying the warrants issued in the John Doe proceedings provided probable cause to believe that evidence of a criminal violation of Wis. Stat. §§ 11.27,11.26(2)(a), 11.61(1), 939.31, and 939.05 would be found in the private dwellings and offices of the two individuals whose dwellings and offices were searched and from which their property was seized.[14]
¶ 359. Justice Ziegler makes no similar attempt to tether her analysis to the issues this court accepted for review.
*186 ¶ 360. I turn now to my analysis of the three John Doe cases, which I address in three separate sections of this writing. I summarize my discussion and conclusions in each of the three cases as follows:
¶ 361. The First Case. This case is an original action filed by Unnamed Movants 6 and 7 against the John Doe judge and the Special Prosecutor.[15] See ¶¶ 389-507, infra.
¶ 362. Two issues of law are presented in the original action.
¶ 363. First is whether Chapter 11 requires a candidate's campaign committee to report certain coordinated disbursements as contributions received by the candidate or candidate's campaign committee— namely, coordinated disbursements made for issue advocacy purposes. Under Chapter 11, a disbursement is coordinated if it is made by a third party "for the benefit of a candidate" and "with the authorization, direction or control of or otherwise by prearrangement with the candidate or the candidate's agent."[16]
¶ 364. If Chapter 11 requires a candidate's campaign committee to report coordinated disbursements for issue advocacy as contributions received by the candidate or candidate's campaign committee, then the *187 second issue presented is whether this reporting requirement is consistent with the state and federal constitutions.
¶ 365. The majority opinion concludes that Chapter 11 does not require a candidate's campaign committee to report any coordinated disbursements for issue advocacy as contributions received by the candidate or candidate's campaign committee. The majority opinion further concludes that such a requirement would be unconstitutional.[17]
¶ 366. The majority opinion frequently refers to "independent groups," "independent organizations," and "independent advocacy organizations." I agree with the United States Court of Appeals for the Seventh Circuit that the word "independent" should be considered to be in quotation marks throughout the John Doe cases "because the Special Prosecutor suspected that the group's independence is ostensible rather than real."[18]
¶ 367. I conclude that Chapter 11 does require a candidate's campaign committee to report coordinated disbursements for issue advocacy as contributions received by the candidate or candidate's campaign committee. I further conclude this reporting requirement is consistent with the First Amendment.
¶ 368. To be clear: I do not conclude that Chapter 11 regulates disbursements for issue advocacy made by truly independent third parties. Chapter 11 does not reach independent disbursements for issue advocacy, even when such disbursements are intended to influence an election.
*188 ¶ 369. The Second Case. This case is a supervisory writ petition filed by the Special Prosecutor in the court of appeals against the John Doe judge and the eight Unnamed Movants. The Special Prosecutor's writ petition seeks review of an order of the John Doe judge quashing subpoenas and ordering the return of property seized pursuant to search warrants. The order was based on the John Doe judge's conclusion of law that Chapter 11 does not regulate coordinated disbursements for issue advocacy.[19] The writ petition is before this court on multiple petitions for bypass. See ¶¶ 508-541, infra.
¶ 370. The majority opinion concludes that even if the John Doe judge misinterpreted and misapplied Chapter 11 and the First Amendment when exercising his discretion to quash subpoenas and order the return of property seized pursuant to search warrants, a supervisory writ is not warranted. The majority opinion reasons that the Special Prosecutor has failed to prove that the John Doe judge violated a plain legal duty.
¶ 371. I conclude that the majority opinion misinterprets and misapplies the plain legal duty criterion for the issuance of a supervisory writ.[20] I conclude that correctly interpreting and applying the law is a plain legal duty. To properly exercise his discretion, the John Doe judge was required to correctly decide the question of law presented. This court can and should, in the exercise of its discretion, issue a supervisory writ to correct a John Doe judge's error of law when appellate review would provide no relief (or inadequate relief) for the harm caused by the error. Because the John Doe *189 judge misinterpreted and misapplied the law and appellate review is not available, I would grant the Special Prosecutor's writ petition.
¶ 372. The Third Case. This case is a review of a court of appeals opinion and order denying a supervisory writ petition filed by Unnamed Movants 2, 6, and 7 against the John Doe judge, the chief judges of the counties in which the proceedings are underway, and the Special Prosecutor. See ¶¶ 542-554, infra.
¶ 373. The petition for review raises questions of law regarding the validity of the Special Prosecutor's appointment and the competency of the Special Prosecutor to conduct the John Doe investigation.
¶ 374. The majority opinion concludes that the court of appeals properly denied the three Unnamed Movants' writ petition because, like the Special Prosecutor in the second case, the three Unnamed Movants have failed to prove that the John Doe judge violated a plain legal duty.[21]
¶ 375. I agree with the majority opinion's affirmance of the court of appeals order denying the writ petition. I conclude, however, that the court of appeals can, should, and did properly decide the issues of law presented in the Unnamed Movants' writ petition. To properly exercise his discretion, the John Doe judge was required to correctly decide these questions of law.[22]
¶ 376. Three Additional Issues. Finally, there are three issues presented in this litigation that are relevant to the John Doe trilogy as a whole. I discuss these three issues in my analysis of the first case (the original action).
*190 ¶ 377. First, several motions to file amicus briefs on the merits of the John Doe cases have been filed in this court. I join the majority opinion's decision to grant them all.
¶ 378. Second, the Special Prosecutor filed a motion seeking the recusal of certain named justices. Three motions to file amicus briefs on the recusal issue have also been filed. Neither the named justices nor the court as a whole has responded to the Special Prosecutor's recusal motion. The recusal motion and the amicus motions remain pending, and the due process concerns they raise remain unresolved.
¶ 379. Third, this court — over my dissent— ordered extensive redactions and sealing in these John Doe cases.[23] Even if some secrecy remains appropriate, the extent of the secrecy this court has imposed is unwarranted.
¶ 380. Despite my numerous dissents objecting to the level of secrecy imposed by this court in the John Doe trilogy, I have endeavored to adhere to this court's sealing and redaction orders. The same cannot be said for the majority opinion and the concurrences authored by Justices Prosser and Ziegler.
¶ 381. The majority opinion declares that "we can interpret the secrecy order and modify it to the extent necessary for the public to understand our decision herein." See majority op., ¶ 14 n.ll. Justice Prosser's concurrence discusses the policy reasons underlying secrecy in John Doe proceedings, concludes that they are inapplicable to certain facts underlying the John Doe trilogy, and thus determines that "discussion of *191 these facts is not inconsistent with the secrecy order." See Justice Prosser's concurrence, ¶ 145.
¶ 382. The majority opinion and Justice Prosser's concurrence decide that the secrecy order does not bind the justices of this court. The secrecy order, in their view, binds only the parties and the public.
¶ 383. Because the majority of this court disregards its own secrecy order, Justice Prosser opines at length, without the benefit of briefs or facts, about allegedly overbroad search warrants and subpoenas. Moreover, he waxes eloquent about privacy and the limits that should be placed on search warrants seeking electronic material. But he has previously waxed eloquent about privacy rights and has nevertheless upheld searches of electronic material that he recognized raise substantial privacy concerns.[24]
¶ 384. Likewise, Justice Ziegler opines at length about the allegedly unconstitutional manner in which the search warrants were executed. She does so without the benefit of briefs or facts.
¶ 385. Both justices opine about issues not previously raised by the parties or the court without giving the parties an opportunity to brief or argue the facts or law relevant to those issues.
¶ 386. In my dissent to the court's redaction order dated March 27, 2015,1 explained at length why this court had the power to disclose information that was ordered by the John Doe judge to be concealed. See my dissent to this court's March 27, 2015, redaction order (attached hereto as Exhibit C). This court disagreed, stating the following in its March 27, 2015, redaction order:
*192 The John Doe investigation that is the subject of the several proceedings this court is reviewing remains an open investigation. While that may complicate how this court normally conducts its appellate review functions, the convenience of this court and the parties/counsel appearing before it does not provide a sufficient basis on which to ignore the statutory commands to maintain secrecy or the rules we have already established for maintaining the secrecy of John Doe materials.
¶ 387. It is unclear what has changed since this court issued its March 27, 2015, redaction order that enables the court to now exempt itself from the secrecy order.
¶ 388. For the reasons set forth, I write separately.
No. 2014AP296-OA: Original Action: State of Wisconsin ex rel. Two Unnamed Petitioners v. Gregory A. Peterson, John Doe Judge, and Francis D. Schmitz, as Special Prosecutor
¶ 389. This original action was filed by Unnamed Movants 6 and 7, naming the Special Prosecutor and the John Doe judge as defendants.
¶ 390. Unnamed Movants 6 and 7 seek a declaration that Chapter 11 restricts campaign finance regulation to express advocacy and regulation of issue advocacy violates the United States and Wisconsin constitutions.
¶ 391. The majority opinion grants Unnamed Movants 6 and 7 their requested relief. I would not.
¶ 392. I conclude that coordinated disbursements for issue advocacy constitute regulated contributions under Chapter 11 and that such regulation *193 does not violate the First Amendment. By coordinated disbursements, I mean disbursements made by third parties "for the benefit of a candidate" and "with the authorization, direction or control of or otherwise by prearrangement with the candidate or the candidate's agent."[25] By issue advocacy, I mean speech regarding issues of public concern that does not expressly advocate the election or defeat of a candidate.[26]
¶ 393. Because I conclude that the Special Prosecutor has a valid legal theory to support his investigation, I would allow the John Doe proceedings to continue. Accordingly, I dissent.
¶ 394. I address the statutory and constitutional issues presented in this original action as follows:
• In Part I, I describe the alleged election-related activities of Unnamed Movants 6 and 7 that are the subject of the John Doe investigation.
• In Part II, I determine that the Special Prosecutor's theory of criminal activity is supported by Chapter 11. I disagree with the majority opinion's holding that coordinated issue advocacy, like independent issue advocacy, is beyond the reach of Chapter 11.
• In Part III, I conclude that the Special Prosecutor's theory of criminal activity does not contravene the state or federal constitution. I disagree with the majority opinion's declarations that the Special Prosecutor's interpretation of Chapter 11 renders *194 Chapter 11 unconstitutional and that a narrowing construction must be applied to prevent Chapter ll's invalidation.
¶ 395. In Part IV, I address three issues that are common to the three cases before the court:
• In section A, I consider the motions to file amicus briefs regarding the merits of the three cases. I join the majority opinion's decision to grant them all.
• In section B, I discuss this court's insistence on continued observance of the sweeping John Doe secrecy order to which the three John Doe cases are subject. In my view, the extent of secrecy mandated by the court is not warranted.
• In section C, I consider the Special Prosecutor's motion requesting the recusal of certain justices from the John Doe cases. The recusal motion is still pending (including any due process concerns), as are three motions to file amicus briefs on the recusal issue.
I
¶ 396. I cannot begin this writing with the usual recitation of facts. There have been no findings of substantive fact by a court or judge, nor stipulations of fact by the parties.[27] This dearth of facts is in sharp *195 contrast to the undisputed facts underlying all prior original actions this court has accepted.[28]
¶ 397. Although Unnamed Movants 6 and 7 claim that the election-related activities alleged by the Special Prosecutor are not regulated by Chapter 11, neither their petition for leave to commence an original action nor their briefs in this court specify the election-related activities to which they are referring.
¶ 398. The Special Prosecutor's brief, on the other hand, sets forth information he has gathered regarding the election-related activities of Unnamed Movants 6 and 7, among others. On the basis of this information, the Special Prosecutor asserts that he has reason to believe that a particular candidate or candidate's campaign committee coordinated with one or more 501(c) nonprofit entities; that these 501(c) nonprofit entities made disbursements for issue ads in coordination with the candidate or candidate's campaign committee; that the ads were intended to benefit the candidate's campaign; and that the candidate's campaign committee unlawfully failed to report these *196 coordinated disbursements as contributions received by the candidate or candidate's campaign committee.[29]
¶ 399. According to the Special Prosecutor, the candidate and candidate's campaign committee coordinated with the 501(c) nonprofit entities in large part through two political operatives, namely Unnamed Movants 6 and 7. The Special Prosecutor contends that Unnamed Movants 6 and 7 were paid by the candidate's campaign committee and by one or more of the 501(c) nonprofit entities. Thus, Unnamed Movants 6 and 7 are alleged to have acted in a dual capacity.
*197 ¶ 400. One of the Special Prosecutor's central allegations is that Unnamed Movants 6 and 7 created and managed a particular 501(c) nonprofit organization to run issue ads for the benefit of the candidate and the candidate's campaign, while the candidate asked donors to contribute to the 501(c) nonprofit organization instead of to the candidate's campaign committee in a blatant attempt to avoid the regulations governing contributions to candidates and their campaign committees. Further, says the Special Prosecutor, while the 501(c) nonprofit entities purchased the issue ads, the candidate — via Unnamed Movants 6 and 7 — controlled their content, timing, and placement.
¶ 401. The "coordination" alleged by the Special Prosecutor thus includes consultation between the candidate, the candidate's campaign committee, Unnamed Movants 6 and 7, various 501(c) nonprofit entities, and associated individuals regarding the content, timing, and placement of issue ads.
¶ 402. The Special Prosecutor contends that the objective underlying this alleged coordination was to ensure that issue ads purchased by the 501(c) nonprofit entities provided the maximum benefit possible to the candidate's campaign. For example, coordination would ensure correct and consistent messaging in the issue ads purchased by the 501(c) nonprofit entities.
¶ 403. Such coordination could also serve to circumvent Chapter ll's contribution restrictions and disclosure requirements. Untold millions of dollars in undisclosed contributions could be tunneled into a 501(c) nonprofit entity that purchases issue ads written or approved by a candidate or the candidate's campaign manager. "If campaigns tell potential contributors to divert money to nominally independent groups that have agreed to do the campaigns' bidding, these contri *198 bution limits become porous, and the requirement that politicians' campaign committees disclose the donors and amounts become useless."[30]
¶ 404. The Special Prosecutor contends in the instant case that coordination transformed the 501(c) nonprofit entities' disbursements for issue advocacy into reportable contributions to the candidate or candidate's campaign committee that the candidate's campaign committee failed to report, violating Chapter 11.[31]
¶ 405. At this stage in the John Doe proceedings, the Special Prosecutor need not prove that the 501(c) nonprofit entities in fact made coordinated disbursements for issue advocacy that were reportable by the candidate's campaign committee as contributions received by the candidate or candidate's campaign committee. Rather, this original action requires the court to determine only whether the Special Prosecutor has a valid legal theory to support his investigation. If charges are eventually filed, only then will a court face the question of whether the alleged coordination took place.
¶ 406. According to the majority opinion, even if the alleged coordination took place, Chapter 11 does not regulate it, and thus the Special Prosecutor does not have a valid legal theory to support his investigation. The majority opinion allows a 501(c) nonprofit entity to work hand-in-glove with a candidate or candidate's campaign committee without violating Chapter 11 so long as the 501(c) nonprofit entity engages only in issue advocacy.
*199 ¶ 407. I address the statutory and constitutional issues presented in turn.
II
¶ 408. The first question presented is whether Chapter 11 requires a candidate's campaign committee to report certain disbursements by 501(c) nonprofit entities as contributions received by the candidate or candidate's campaign committee — namely, disbursements for issue advocacy made in coordination with the candidate or candidate's campaign committee. I conclude that it does.
¶ 409. Chapter 11 is not easy to read or understand. It has been described as "labyrinthian [sic] and difficult to decipher without a background in this area of the law."[32] Nevertheless, through careful reading and cognizance of certain fundamentals of campaign finance law, Chapter 11 can be and has been deciphered. State and federal courts have successfully interpreted and applied its provisions in a number of cases.[33]
¶ 410. With that in mind, I turn to an examination of the provisions of Chapter 11 at issue in this original action.
¶ 411. As an initial matter, there is no dispute that under Wis. Stat. § 11.05(2g), a candidate's campaign committee is a "registrant" for purposes of Chapter 11. It is also undisputed that under Wis. Stat. § 11.06(1), "each registrant" must report all "contributions received" and all "disbursements made."
¶ 412. But what constitutes a "contribution" or "disbursement" under Chapter 11? Because the parties *200 contest the proper interpretation of these words (and thus the scope of the reporting obligation to which a candidate's campaign committee is subject), I turn to their statutory definitions.
¶ 413. "Contribution" is defined as, among other things, "[a] gift, subscription, loan, advance, or deposit of money or anything of value . .. made for political purposes." Wis. Stat. § 11.01(6)(a) (emphasis added).[34] "Disbursement" is defined as, among other things, "[a] purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value . . . made for political purposes." Wis. Stat. § 11.01(7)(a) (emphasis added).[35]
¶ 414. An act done "for political purposes" is defined by Wis. Stat. § 11.01(16) as an act "done for the purpose of influencing the election or nomination for election of any individual to state or local office . . . ." *201 (Emphasis added.)[36] According to Unnamed Movants 6 and 7, the phrase "for the purpose of influencing [an] election," and thus the phrase "for political purposes," encompasses only express advocacy. The Special Prosecutor, on the other hand, contends that the phrase is broader and can encompass both express advocacy and issue advocacy.
¶ 415. The statutory definition of the phrase "for political purposes" specifically mentions express advocacy, stating: "Acts which are for 'political purposes' include but are not limited to. . . communication which expressly advocates the election, defeat, recall *202 or retention of a clearly identified candidate . . . ."[37] Thus, there is no question that disbursements made for express advocacy are made "for political purposes" within the meaning of Chapter 11.
¶ 416. But the statutory definition of the phrase "for political purposes" makes equally clear that its meaning is not limited to express advocacy. Section 11.01(16) states that acts for political purposes "include but are not limited to" express advocacy. It further states that "[i]n the case of a candidate ... all administrative and overhead expenses . . . are deemed to be for a political purpose."[38] Administrative and overhead expenses are not advocacy at all, let alone express advocacy.
¶ 417. Thus, the contention by Unnamed Movants 6 and 7 and the conclusion of the majority opinion that contributions and disbursements are reportable under Chapter 11 only when they are made for express advocacy purposes do not square with the statutory language.
¶ 418. Nor does their position square with the function that issue advocacy may play in elections. An issue ad may seek to raise awareness about an issue generally or to inform voters of a candidate's position on an issue. The latter category of issue advocacy may influence voters' impressions of certain candidates and may therefore influence elections.[39] Accordingly, I con- *203 elude that the statutory definition of the phrase "for political purposes" encompasses issue advocacy.
¶ 419. Not every issue ad, however, will benefit a particular candidate's campaign — even if it is intended to do so. When issue ads are developed independently of the candidate or the candidate's campaign committee, the issue advocacy "might be duplicative or counterproductive from a candidate's point of view."[40]
¶ 420. In contrast, when issue ads are developed in coordination with the candidate or the candidate's campaign committee, the disbursements made for such ads "are as useful to the candidate as cash . . . ."[41] For this reason, the United States Supreme Court has consistently treated coordinated expenditures as regu *204 lated contributions.[42] The United States Supreme Court has not differentiated between coordinated expenditures made for issue advocacy purposes and coordinated expenditures made for express advocacy purposes. The key factor for the Court has been coordination.
¶ 421. This brings me to the next relevant provision within Chapter 11: Wis. Stat. § 11.06(4).[43] This provision dictates when contributions are reportable by registrants. Two subsections are relevant here.
*205 ¶ 422. First, Wis. Stat. § 11.06(4)(a) declares as a general matter that a contribution is received by a candidate "when it is under the control of the candidate or campaign treasurer," or the candidate or treasurer accepts the benefit thereof. When a contribution is so received, it becomes reportable.
¶ 423. Second, Wis. Stat. § 11.06(4)(d) declares that when a disbursement is made "for the benefit of a candidate," it "is reportable by the candidate or the candidate's personal campaign committee if it is made . . . with the authorization, direction or control of or otherwise by prearrangement with the candidate or the candidate's agent." (Emphasis added.)
1 424. Although Wis. Stat. § 11.06(4)(d) fails to explicitly state that coordinated disbursements are reportable by the candidate's campaign committee as contributions to the candidate or candidate's campaign committee, this interpretation is compelled by the statutory context. All other subsections of § 11.06(4) explicitly govern the receipt and reporting of contribu *206 tions. The clear implication is that § 11.06(4)(d) governs the receipt and reporting of contributions.
¶ 425. This interpretation is also supported by common sense. Disbursements made in coordination with a candidate are as valuable to the candidate as cash, according to the United States Supreme Court, and are therefore treated as contributions under federal law.[44] The same logic applies here: Disbursements made "by prearrangement with the candidate or the candidate's agent" are as valuable to the candidate as cash and are therefore treated as contributions under Wisconsin law.[45]
¶ 426. In contrast, a disbursement made without prearrangement with a candidate or the candidate's agent is an independent disbursement, not a contribution to the candidate or candidate's campaign committee, and is governed by different rules.[46]
¶ 427. As this discussion makes clear, the words "contribution" and "disbursement" have distinct but intertwined meanings within Chapter 11. The Special Prosecutor's theory of criminal activity in the instant *207 case relies upon the connection between the two. He argues that when a 501(c) nonprofit entity makes disbursements for issue advocacy in coordination with a candidate's campaign committee, such disbursements are reportable by the candidate's campaign committee as contributions received by the candidate or candidate's campaign committee. He further argues that he has reason to believe a particular candidate's campaign committee is guilty of violating Chapter 11 by failing to fulfill this reporting obligation.[47]
¶ 428. For the reasons set forth, the Special Prosecutor's theory of criminal activity in the John Doe proceedings underlying this original action has a sound basis in the statutory text.
f 429. Because I agree with the Special Prosecutor that Chapter 11 requires a candidate's campaign committee to report coordinated disbursements for issue advocacy as contributions received by the candidate or candidate's campaign committee, I now consider whether this interpretation of Chapter 11 is constitutionally permissible. As might be expected, the Special Prosecutor says it is, while Unnamed Movants 6 and 7 and the majority opinion say it is not.
Ill
¶ 430. Two constitutional questions are presented in this original action. The first is whether Chapter 11's requirement that a candidate's campaign *208 committee report coordinated disbursements for issue advocacy as contributions to the candidate or candidate's campaign committee violates the First Amendment. The second is whether the provisions of Chapter 11 that impose the reporting requirement at issue are unconstitutionally vague or overbroad. Whether the reporting requirement at issue is contrary to the First Amendment and whether the provisions imposing that requirement are unconstitutionally vague or over-broad are interrelated questions.[48] I address these questions in turn.
¶ 431. The absolutist constitutional position advanced by Unnamed Movants 6 and 7 and adopted by the majority opinion hook, line, and sinker is that the First Amendment bars the State from regulating any issue advocacy in any manner. In their view, the First Amendment protects against state regulation of disbursements for issue advocacy regardless of whether the disbursements are made independently or in coordination with a candidate or candidate's campaign committee. I disagree.
¶ 432. The majority opinion's rhetoric would lead the reader to conclude that the case law provides a clear answer to the First Amendment issue before the court, namely that the Unnamed Movants' position is correct and that the Special Prosecutor's position "is unsupported in either reason or law."[49] The majority opinion's view contradicts the views expressed by both the John Doe judge and the United States Court of Appeals for the Seventh Circuit.
*209 ¶ 433. The John Doe judge observed that the First Amendment question presented in this original action has "spawned considerable litigation."[50] It is, he explained, "an important question" that deserves, but does not yet have, "a definitive answer."[51]
¶ 434. Similarly, in O'Keefe v. Chisholm, 769 F.3d 936 (7th Cir. 2014), cert. denied, 135 S. Ct. 2311 (2015), the Seventh Circuit Court of Appeals made it perfectly clear that the Special Prosecutor's theory is rooted in a live legal issue. The O'Keefe court stated that whether coordinated issue advocacy disbursements are regulable under the First Amendment is far from "beyond debate."[52] On the contrary, it explained: The Special Prosecutor's theory of criminal activity in the John Doe investigation underlying this litigation "reflects Buckley's interpretation of the First Amendment."[53] Indeed, the O'Keefe court stated, "[n]o opinion issued by the Supreme Court, or by any court of appeals, *210 establishes ('clearly' or otherwise) that the First Amendment forbids regulation of coordination between campaign committees and issue-advocacy groups — let alone that the First Amendment forbids even an inquiry into that topic."[54]
¶ 435. This statement in O'Keefe is particularly telling considering that the majority opinion relies heavily on a prior opinion of the same federal court of appeals: Wisconsin Right to Life, Inc. v. Barland (Barland II), 751 F.3d 804 (7th Cir. 2014). Borland II does not render this original action an open-and-shut case, much as the majority opinion would like us to believe.
¶ 436. Like the John Doe judge and the Seventh Circuit Court of Appeals, I conclude that the constitutional question presented has not yet been definitively resolved. The answer must be deduced through careful analysis of a complex body of federal case law that has *211 set forth principles governing the constitutionality of campaign finance statutes. In my view, this careful analysis reveals that Chapter ll's requirement that a candidate's campaign committee report coordinated issue advocacy disbursements as contributions received by the candidate or candidate's campaign committee does not violate the First Amendment.
¶ 437. The federal case law governing the constitutionality of campaign finance statutes, much like Chapter 11, presents a labyrinth that must be navigated. The starting point is Buckley v. Valeo, 424 U.S. 1 (1976), a long and complex opinion that considered whether various provisions of the Federal Election Campaign Act of 1971, as amended in 1974, were consistent with the First Amendment.
¶ 438. Buckley drew a distinction between contributions to candidates and their campaign committees, on the one hand, and independent expenditures for political expression, on the other hand.[55] It declared that under the First Amendment, ceilings may be imposed on contributions but not on independent expenditures.[56] The Buckley Court reached this conclusion by scrutinizing the burdens imposed on political speech by contributions and independent expenditure limits, respectively, and by evaluating those burdens in light of the governmental interests such limits serve.[57]
*212 ¶ 439. The Buckley Court first determined that the burden imposed on political speech by contribution limits is minimal: "A limitation on the amount of money a person may give to a candidate or campaign organization [] involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not. . . infringe [on] the contributor's freedom to discuss candidates and issues."[58] The Court then declared that the government's interest in "the prevention of corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions" provides a "constitutionally sufficient justification" for this minimal burden.[59]
¶ 440. In contrast, the Buckley Court declared that independent expenditure limits "impose direct and substantial restraints on the quantity of political speech" that are not justified by the government's anti-corruption interest.[60] Unlike contributions, the Court explained,
independent expenditures may 0 provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate.[61]
¶ 441. After upholding contribution limits and striking down independent expenditure limits, the *213 Buckley Court turned to the constitutionality of disclosure requirements. It concluded that such requirements are constitutionally permissible as applied both to contributions and to independent expenditures made for express advocacy purposes,[62] reasoning that disclosure requirements impose no ceiling on political speech and are an effective anti-corruption measure.[63] Indeed, the Court explained, disclosure requirements "appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist."[64]
¶ 442. In all three regulatory contexts — that is, with regard to contribution limits, independent expenditure limits, and disclosure requirements — the Buckley Court made one point eminently clear: Coordinated expenditures constitute contributions to the candidate or candidate's campaign committee for purposes of federal law. More specifically, the Court held that federal law treats expenditures as contributions received by the candidate or candidate's campaign committee if the expenditures are prearranged or coordinated with the candidate or are "placed in cooperation with or with the consent of a candidate."[65] After all, the Court explained, these expenditures are *214 in reality "disguised contributions."[66] Disguised contributions are subject to the limitations and disclosure requirements that govern all other contributions.[67]
¶ 443. In declaring that coordinated expenditures constitute disguised contributions to the candidate or candidate's campaign committee, the Buckley Court did not specify whether it meant all coordinated expenditures or only coordinated expenditures made for express advocacy purposes. The Buckley Court's broad statement that coordinated expenditures constitute disguised contributions would seem to compel the conclusion that the type of advocacy such expenditures implement is irrelevant; the coordination is what matters. This is the approach taken by the Special Prosecutor. Unnamed Movants 6 and 7, however, urge this court to hold that only coordinated expenditures for express advocacy constitute disguised contributions.
¶ 444. Subsequent case law sheds light on this issue. Post -Buckley decisions have followed Buckley's holding that coordinated expenditures are subject to the limitations and disclosure requirements governing contributions. The case law discussing coordinated expenditures has not distinguished between coordinated expenditures for express advocacy and for issue advocacy.
¶ 445. Federal Election Commission v. Colorado Republican Federal Campaign Committee (Colorado II), 533 U.S. 431, 446 (2001), is illustrative. The Colorado II Court reaffirmed Buckley's analysis of disguised contributions, explaining that there is no *215 difference between coordinated expenditures and direct contributions to a candidate or candidate's campaign committee that would justify treating the two differently.[68] Coordinated expenditures, like contributions, might be given as a quid pro quo for improper commitments from the candidate.
¶ 446. The Colorado II Court summarized Buckley's discussion of disguised contributions as follows:
[In Buckley], the rationale for endorsing Congress's equation of coordinated expenditures and contributions was that the equation "prevent[s] attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions." The idea was that coordinated expenditures are as useful to the candidate as cash, and that such "disguised contributions" might be given "as a quid pro quo for improper commitments from the candidate" (in contrast to independent expenditures, which are poor sources of leverage for a spender because they might be duplicative or counterproductive from a candidate's point of view). In effect, therefore, Buckley subjected limits on coordinated expenditures by individuals and nonparty groups to the same scrutiny it applied to limits on their cash contributions.[69]
*216 ¶ 447. In Federal Election Commission v. Christian Coalition, 52 F. Supp. 2d 45, 87-88 (D.D.C. 1999), the D.C. District Court rejected as untenable the notion that coordinated express advocacy expenditures and coordinated issue advocacy expenditures should be treated differently.[70] Both constitute disguised contributions, the court held, and both should be treated as such.[71]
¶ 448. The Christian Coalition court made clear that issue advocacy is not beyond the reach of a state's regulatory power as a matter of constitutional law, explaining that the First Amendment permits "only narrowly tailored restrictions on speech that advance the Government's anti-corruption interest, but the Coalition's position allows for no restrictions at all on [coordinated issue advocacy] expenditures."[72] The Christian Coalition court then declared that the distinction drawn in Buckley between issue advocacy and express advocacy is of no constitutional or statutory import in the realm of coordinated expenditures:
importing the 'express advocacy' standard into [the contribution regulation at issue] would misread Buck *217 ley and collapse the distinction between contributions and independent expenditures in such a way as to give short shrift to the government's compelling interest in preventing real and perceived corruption that can flow from large campaign contributions.[73]
¶ 449. Christian Coalition recognizes that distinguishing between coordinated issue advocacy expenditures and coordinated express advocacy expenditures would ignore the basic fact that both can be "as useful to the candidate as cash."[74] Indeed, the Christian Coalition court explained that
[c]oordinated expenditures for [communications that spread a negative message about an opponent] would be substantially more valuable than dollar-equivalent contributions [to a candidate] because they come with an 'anonymity premium' of great value to a candidate running a positive campaign. Allowing such coordinated expenditures would frustrate both the anticorruption and disclosure goals of the Act.[75]
¶ 450. In my opinion, Christian Coalition provides a persuasive reading of the First Amendment principles set forth in Buckley and its progeny.[76] It pays heed to the functionalist approach the case law *218 takes to distinguishing between contributions to the candidate or candidate's campaign committee and independent expenditures,[77] and it is careful not to extend prior campaign finance holdings beyond their intended scope. It is also supported by federal case law, which makes clear that campaign finance disclosure requirements can constitutionally reach beyond express advocacy and its functional equivalent and thus makes clear that the express/issue advocacy distinction is not constitutionally relevant in all campaign finance contexts.[78]
*219 ¶ 451. I move on to Wisconsin Right to Life v. Barland, (Barland II), 751 F.3d 804 (7th Cir. 2014). Despite implications to the contrary in the majority *220 opinion, Barland II is consistent with Christian Coalition. Barland II addresses the regulation of independent spending under Chapter 11, while Christian Coalition tackles the regulation of coordinated spending under federal law.
¶ 452. In Barland II, Wisconsin Right to Life (a 501(c) nonprofit entity) and its state political action committee challenged various provisions within Chapter 11 as unconstitutional only insofar as those provisions "trigger [ed] . . . restrictions and requirements for independent groups not under the control of a candidate or candidate's committee . . . ,"[79] The Barland II court was careful to note that Wisconsin Right to Life and its state PAC "operate [d] independently of candidates and their campaign committees."[80]
*221 ¶ 453. In contrast to the independent groups at issue in Borland II, in the instant case the Special Prosecutor contends that 501(c) nonprofit entities made disbursements for issue ads in coordination with a candidate's campaign committee. The disbursements at issue in the present case are not independent. Borland II does not extend beyond the context of independent political speech and is therefore not dispositive of the First Amendment question presented in this original action.
| 454. Given this case law, I would hold that in the eyes of both Chapter 11 and the First Amendment, coordinated disbursements are disguised contributions regardless of whether they are made for express advocacy or issue advocacy purposes. Accordingly, in contrast to the majority opinion, I would hold that Chapter ll's requirement that a candidate's campaign committee report coordinated issue advocacy disbursements as contributions is consistent with the First Amendment.
¶ 455. Unnamed Movants 6 and 7 further contend, and the majority opinion holds, that their interpretation of Chapter 11 is compelled by the doctrines of overbreadth and vagueness. I turn to this argument now.
¶ 456. The Unnamed Movants' positions on over-breadth and vagueness are twofold.
¶ 457. First, they urge that the phrase "for political purposes," which is part of Chapter ll's definitions of the words "contribution"[81] and "disbursement,"[82] is unconstitutionally vague and overbroad unless the phrase is read to mean "for express advocacy purposes."
*222 ¶ 458. Second, Unnamed Movants 6 and 7 contend that the concept of "coordination" within Chapter 11 is fatally imprecise. In their view, the provisions of Chapter 11 that ostensibly regulate coordination, including § 11.06(4)(d), should be struck down as unconstitutionally vague and overbroad or, at the very least, limited to express advocacy.
¶ 459. I address these arguments in turn. To address overbreadth and vagueness arguments relating to the phrase "for political purposes," I return to Buckley and Borland II. Unnamed Movants 6 and 7 contend, and the majority opinion agrees, that an express-advocacy limiting construction must be applied in the instant case based on Buckley and Borland II. They misread the case law.
¶ 460. The Buckley Court applied an express-advocacy limiting construction to two statutory provisions, one imposing a limit on expenditures and one requiring that expenditures be reported.
¶ 461. The provision imposing a limit on expenditures stated that "[n]o person may make any expenditure . . . relative to a clearly identified candidate during a calendar year which, when added to all other expenditures made by such person during the year advocating the election or defeat of such candidate, exceeds $1,000."[83] The challengers in Buckley argued that the phrase "relative to a clearly identified candidate" is unconstitutionally vague. The Buckley Court agreed.
¶ 462. The Buckley Court explained that the challenged provision failed to clarify whether it covered both express advocacy and issue advocacy expenditures. The Court decided, however, that in the con *223 text of the provision as a whole, the phrase "relative to a clearly identified candidate" could mean "advocating the election or defeat of a candidate," that is, could mean express advocacy.[84] The Court determined that this reading would avoid vagueness concerns. Thus, it construed the expenditure limit as applying only to express advocacy.
¶ 463. The second provision to which the Buckley Court applied an express-advocacy limiting construction required expenditures to be disclosed. The word "expenditure" was defined "in terms of the use of money or other valuable assets 'for the purpose of. . . influencing' the nomination or election of candidates for federal office."[85] The Court determined that vagueness concerns arose insofar as this expenditure disclosure provision applied to individuals other than candidates and political committees because the phrase "for the purpose . . . of influencing [an election]" carries the potential "for encompassing both issue discussion and advocacy of a political result."[86]
¶ 464. To avoid vagueness concerns, the Court again applied an express-advocacy limiting construction, this time to the phrase "for the purpose of. . . influencing [an election]." The Court held that the expenditure disclosure provision required expenditures by entities other than candidates and political committees to be disclosed under only two circumstances: (1) when the expenditures were authorized or requested by a candidate or his agent (i.e., coordinated expenditures); and (2) when the expenditures were for express advocacy (i.e., independent express advocacy *224 expenditures).[87] Independent issue advocacy expenditures were not required to be disclosed.
¶ 465. Importantly, the Buckley Court's application of these express-advocacy limiting constructions was confined to the realm of independent expenditures. As previously explained, the Buckley Court considered coordinated expenditures to be "disguised contributions."[88] Buckley expressly rejected the argument that the statutory provisions imposing limits and disclosure requirements on contributions were unconstitutionally vague or overbroad.[89]
¶ 466. Further, in applying express-advocacy limiting constructions to the statutory provisions imposing limits and disclosure requirements on independent expenditures, the Buckley Court did not establish as a matter of constitutional law that regulation of issue advocacy is impermissible. No United States Supreme Court decision, and no decision of this court (until today), has gone so far.[90]
¶ 467. Although the majority opinion removes all issue advocacy from state regulation, the United States Supreme Court in McConnell v. Federal Election Commission, 540 U.S. 93, 190-91 (2003), overruled on other grounds by Citizens United v. Fed. *225 Election Comm'n, 558 U.S. 310 (2010), explicitly ruled that it would be a "misapprehen[sion]" to read Buckley as holding that there exists "a constitutionally mandated line between express advocacy and so-called issue advocacy, and that speakers possess an inviolable First Amendment right to engage in the latter category of speech."[91] Rather, said the McConnell Court,
a plain reading of Buckley makes clear that the express advocacy limitation, in both the expenditure and the disclosure contexts, was the product of statutory interpretation rather than a constitutional command. In narrowly reading the [federal law] provisions in Buckley to avoid problems of vagueness and over-breadth, we nowhere suggested that a statute that was neither vague nor overbroad would be required to toe the same express advocacy line.[92]
¶ 468. With this United States Supreme Court precedent in mind, the Borland II court took up the issues of vagueness and overbreadth within Chapter 11.
¶ 469. The statutory provision considered by the Borland II court that is relevant to this original action is Wis. Stat. § 11.01(16), which (as explained previously) defines the phrase "for political purposes."
¶ 470. Pursuant to § 11.01(16), an act is done "for political purposes" when it is intended to influence an election. The Borland II court considered the meaning of the "influence an election" language in the context of *226 reporting requirements and other duties and restrictions applicable to the independent political speakers at issue in that case.
¶ 471. The Barland II court announced that as applied to independent political speakers, the phrase "for political purposes" must be narrowly construed to cover only "express advocacy and its functional equivalent."[93] The factual scenario presented to this court in this original action was expressly excluded from Barland II's express-advocacy limiting construction.[94] Barland II does not require this court to apply an express-advocacy limiting construction beyond the context of the independent political speech involved in that case.
¶ 472. Keeping in mind the express-advocacy limiting constructions applied in Buckley to the phrases "relative to a clearly identified candidate" and "for the purposes of.. . influencing.. . [an] election," and in Barland II to the phrase "for the purpose of influencing [an] election," I turn to the vagueness and overbreadth challenges advanced by Unnamed Movants 6 and 7 and accepted by the majority opinion in this original action.
¶ 473. The fundamental point to remember in deciding campaign finance law cases is that context is key. When vagueness or overbreadth concerns arise in the campaign finance context, they arise with regard to particular conduct and specified political speakers. When a limiting construction has been applied to a campaign finance statute, it has been applied with *227 regard to particular conduct and specified political speakers.[95] Just because a phrase is vague or over-broad in one context within Chapter 11 does not mean it is vague or overbroad throughout the Chapter.
¶ 474. The provision at issue in the instant case is the requirement in Wis. Stat. § 11.06(1) that registrants report all contributions received. The definition of "contribution" under Chapter 11 comports with the definition of "contribution" considered in Buckley: Anything of value given for the purposes of influencing an election. The Buckley Court expressly declined to apply an express-advocacy limiting construction to the phrase "for the purpose of influencing [an] election" in the definition of "contribution," finding no constitutional infirmity:
The Act does not define the phrase "for the purpose of influencing" an election that determines when a gift, loan, or advance constitutes a contribution. Other courts have given that phrase a narrow meaning to alleviate various problems in other contexts. The use of the phrase presents fewer problems in connection with the definition of a contribution because of the limiting connotation created by the general understanding of what constitutes a political contribution.[96]
*228 ¶ 475. I would adhere to Buckley and its progeny. I would not construe Wis. Stat. § 11.06(1) as excluding coordinated disbursements for issue advocacy from its general requirement that "all contributions received" by a candidates or candidate's campaign committee be reported by the candidate's campaign committee.
¶ 476. The second contention advanced by Unnamed Movants 6 and 7 — that the concept of "coordination" is vague and overbroad and thus must be limited to express advocacy or invalidated altogether —also fails.[97]
¶ 477. Unnamed Movants 6 and 7 do not tether their broader argument to a particular statutory text. They claim that the various provisions within Chapter II that might be interpreted as regulating coordina *229 tion (such as § 11.06(4)(d), which provides that coordinated disbursements are reportable by a candidate's campaign committee) fail to define sufficiently the concept of coordination. Thus, Unnamed Movants 6 and 7 assert that the provisions are unconstitutionally vague and overbroad.
¶ 478. In McConnell v. Federal Election Commission, 540 U.S. 93 (2003), overruled on other grounds by Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010), the United States Supreme Court rejected a similar argument. The federal law under review in McConnell provided that coordinated expenditures were "expenditures made 'in cooperation, consultation, or concerft] with, or at the request or suggestion of a candidate."[98] The McConnell Court stated that this "longstanding definition of coordination 'delineates its reach in words of common understanding.' "[99] Thus, the Court observed, it had "survived without constitutional challenge for almost three decades."[100] The Court concluded that this "definition of coordination gives 'fair notice to those to whom [it] is directed,' and is not unconstitutionally vague."[101]
¶ 479. The language of Wis. Stat. § 11.06(4)(d) is similar, though not identical, to the language at issue in McConnell. As in McConnell, this language delineates the reach of Chapter ll's concept of coordination "in words of common understanding."[102]
1 480. Center for Individual Freedom v. Madigan, 697 F.3d 464 (7th Cir. 2012) is also instructive. In Madigan, a 501(c) nonprofit entity engaged in issue *230 advocacy challenged the disclosure regime in effect in Illinois as unconstitutionally vague and overbroad on its face.[103]
¶ 481. As under Chapter 11, the Illinois statutes required contributions to be reported. The challengers took issue with the definition of "contribution," which included "[an] expenditure 'made in cooperation, consultation, or concert with another political committee' . . . ."[104] The Illinois statutes further provided that the word "contribution" included "any 'electioneering communication made in concert or cooperation with or at the request, suggestion, or knowledge of a candidate, a political committee, or any of their agents.' "[105]
¶ 482. According to the challengers, these provisions "are vague because they do not specify the 'degree of actual agreement required.' "[106] Citing McConnell, the Madigan court observed that the challenged provisions are "no less clear than the federal definition which has long passed muster in the Supreme Court."[107] The Madigan court thus rejected the challengers' claim, concluding that "the coordination language of [Illinois' campaign finance law] is clear enough to provide a reasonably intelligent person 'fair warning' of what sort of conduct is covered."[108]
¶ 483. I would adhere to McConnell and Madigan and would decline to hold that the concept of "coordination" within Chapter 11 is unconstitutionally vague or overbroad. Accordingly, no limiting construction need be applied.
*231 ¶ 484. In sum, I conclude that Chapter ll's requirement that a candidate's campaign committee report coordinated disbursements for issue advocacy as contributions received by the candidate or candidate's campaign committee does not violate the First Amendment and that the provisions of Chapter 11 imposing this requirement are neither vague nor over-broad.
¶ 485. In light of the statutory and constitutional validity of the Special Prosecutor's interpretation of Chapter 11 and given the strong policy against intervening in ongoing criminal investigations, I conclude that the John Doe proceedings should not be terminated.
IV
¶ 486. I now examine three issues that are common to all three of the John Doe cases before the court.
A
¶ 487. This court has received several non-party motions to file amicus briefs regarding the merits of the John Doe trilogy. I join the majority opinion's decision to grant these motions. A grant is consistent with the court's Internal Operating Procedures and past practices.
¶ 488. Motions to submit amicus briefs addressing the merits of the John Doe trilogy have been filed by the following: (1) Wyoming Liberty Group; (2) the Wisconsin Government Accountability Board; (3) various former members of the Federal Election Commission; (4) the Honorable Bradley A. Smith, the Center for Competitive Politics, and Wisconsin Family Action; *232 (5) Campaign Legal Center, Democracy 21, Common Cause in Wisconsin, and League of Women Voters of Wisconsin; (6) Citizens for Responsible Government Advocates, Inc.; and (7) Wisconsin Right to Life.
¶ 489. This court generally grants motions to file amicus briefs "if it appears that the movant has special knowledge or experience in the matter at issue in the proceedings so as to render a brief from the movant of significant value to the court." Wis. S. Ct. IOP II-B.6.C. (May 4, 2012). I conclude that the movants listed above have special knowledge or experience and thus that their views would be of significant value to the court. Indeed, in a case of such profound public importance, this court can use all the help that is offered.
B
¶ 490. The Special Prosecutor requested the recusal of certain justices from the John Doe trilogy.
¶ 491. Non-party motions requesting to file amicus briefs on the recusal issue were filed by the following: (1) the James Madison Center for Free Speech; (2) the Ethics and Public Policy Center; and (3) a group of professors of legal ethics.
¶ 492. On a motion to disqualify a justice, justices have, in other cases, explained why they will participate[109] or why they will not.[110] The justices *233 named in the recusal motion at issue are obviously participating. They have provided no response to the motion, however, choosing instead to remain silent.
¶ 493. The Special Prosecutor's recusal motion can be read in multiple ways. It can easily be read as being directed only to the named justices, seeking their self-disqualification. It can also be read as directed to the court, seeking the court's review of a Justice's statement that he or she need not self-disqualify. No Justice has made such a statement in the instant cases. Finally, the Special Prosecutor's recusal motion can be read as seeking the court's review of due process considerations should the named Justices choose not to self-disqualify.
¶ 494. The Special Prosecutor's recusal motion cites Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009). In Caperton, the plaintiff moved to disqualify a justice of the Supreme Court of West Virginia on the grounds of bias resulting from campaign contributions and expenditures. The justice denied the plaintiffs *234 motion, and the Supreme Court of West Virginia ruled against the plaintiff on the merits of the case. The United States Supreme Court reversed and remanded, ruling that due process required recusal under the circumstances presented.
¶ 495. Caperton teaches that there are "circumstances 'in which experience teaches that the probability of actual bias on the part of the judge or decision-maker is too high to be constitutionally tolerable.' "[111]
¶ 496. Caperton holds that "Due Process requires an objective inquiry into whether the contributor's influence on the election under all the circumstances 'would offer a possible temptation to the average . . . judge to . . . lead him [or her] not to hold the balance nice, clear and true.' "[112] See also Williams-Yulee v. Fla. Bar, 135 S. Ct. 1656, 1667 (2015) ("[E]ven if judges were able to refrain from favoring donors, the mere possibility that judges' decisions may be motivated by the desire to repay campaign contributions is likely to undermine the public's confidence in the judiciary.") (internal quotation marks omitted).
¶ 497. According to the Caperton Court, the participation of a justice who should have disqualified himself or herself violates a litigant's constitutional due process rights and necessitates a do-over.[113] For a discussion of a justice's recusal in Wisconsin, see State v. Herrmann, _ WI _, _ Wis. 2d __, 867 N.W.2d 772.
¶ 498. If the Special Prosecutor is presenting a due process argument to the court as a whole — that is, if the Special Prosecutor is asking the court to declare *235 whether participation by the justices named in the recusal motion violates due process rights — such a motion should be made more clearly.
¶ 499. In any event, the Special Prosecutor's recusal motion and the motions to file amicus briefs on the issue of recusal remain unresolved.
C
¶ 500. Over the extended lives of the John Doe trilogy in this court, the court has accepted the parties' filings under seal for long periods without examining or ruling on the validity of the parties' motions to seal. Since beginning to examine the sealed documents, the court has kept too many documents under seal and has allowed the parties to redact too much information from their filings.[114]
¶ 501. The court's decisions on sealing and redaction up to this point have been rooted entirely in the sweeping John Doe secrecy orders that were issued by the John Doe judge many months ago under very different circumstances. This court, in my opinion, should have independently determined whether the justifications for secrecy in John Doe proceedings still apply to the John Doe trilogy in this court. Instead, the court has, for the most part, continued to seal or redact *236 all documents that were sealed by the John Doe judge without making this determination, concluding that its obligation is to abide by the John Doe judge's secrecy order.
¶ 502. Although I have publicly disagreed with the court's orders regarding sealing and redactions,[115] I have made every effort to abide by those orders. Precedent requires me and this court to abide by this court's secrecy orders. State ex rel. Niedziejko v. Coffey, 22 Wis. 2d 392, 398, 126 N.W.2d 96 (1964), relied on by this court's sealing and redaction orders, provides that secrecy orders issued by a magistrate are binding on that magistrate. In the instant case, this court is the magistrate that issued the relevant secrecy orders. Thus, the secrecy orders bind not just the parties, but also this court.
¶ 503. The court's March 27, 2015, redaction order recognizes this principle, stating that "the fact that a John Doe proceeding becomes the subject of review in an appellate court. . . does not eliminate the secrecy of documents and other information that are covered by a secrecy order issued by a John Doe judge."
*237 ¶ 504. The majority opinion and Justice Prosser's concurrence disregard this principle.[116] The majority opinion declares, without citation to any authority, that "we can interpret the secrecy order and modify it to the extent necessary for the public to understand our decision herein."[117] Justice Prosser's concurrence discusses the policy reasons underlying secrecy in John Doe proceedings, concludes that they do not support continued concealment of certain facts underlying the John Doe trilogy, and then unilaterally determines that "those facts are now outside the scope of the secrecy order."[118]
¶ 505. The majority opinion and Justice Prosser's concurrence not only defy this court's March 27, 2015, redaction order; they also contradict that order's reasoning. The court's March 27, 2015, redaction order explicitly concludes that a John Doe judge's secrecy order remains binding when the John Doe proceedings subject to that order reach this court.
¶ 506. In sum: I have repeatedly dissented to the excessive sealing and redactions this court has imposed in the John Doe trilogy and I have repeatedly dissented to this court's position that the John Doe secrecy order automatically binds this court, but I nevertheless conclude that the secrecy orders issued by this court (over my dissent) are binding on this court. As explained above, it is settled law that a "magistrate" who issues a secrecy order is bound by that *238 secrecy order. The majority opinion and Justice Prosser's concurrence improperly ignore this principle.
* * * *
¶ 507. For the reasons set forth, I dissent to the majority opinion's resolution of the original action.
2014AP417-W through 2014AP421-W: Supervisory Writ & Appeal: State of Wisconsin ex rel. Francis D. Schmitz v. Gregory A. Peterson, John Doe Judge
¶ 508. In the second John Doe case before the court, the Special Prosecutor petitioned the court of appeals for a supervisory writ and writ of mandamus seeking review of a decision and order of the John Doe judge dated January 10, 2014, which quashed subpoenas and ordered the return of property seized pursuant to search warrants.
¶ 509. The defendants are the John Doe judge and eight Unnamed Movants. Several Unnamed Movants filed petitions to bypass the court of appeals, which this court granted.
¶ 510. The John Doe judge's January 10, 2014, order was based on his conclusion of law that the Wisconsin statutes do not regulate disbursements for issue advocacy made by a 501(c) nonprofit entity in coordination with a candidate or candidate's campaign committee.[119] The John Doe judge appears to have reached this conclusion of law based in part on First Amendment principles.
¶ 511. This court must decide whether to issue a supervisory writ reversing the John Doe judge's January 10, 2014, order. The majority opinion holds that no *239 supervisory writ shall issue because the Special Prosecutor has not met one of the criteria for the issuance of a supervisory writ. According to the majority opinion, the Special Prosecutor has failed to prove that the John Doe judge violated a plain legal duty when he quashed subpoenas and ordered the return of property seized pursuant to search warrants.[120]
f 512. The majority opinion holds not that the John Doe judge's interpretation of Wisconsin's campaign finance statutes was correct (although the majority opinion's discussion of the original action implies as much), but rather that the validity of the John Doe judge's interpretation and application of statutes is not a proper basis upon which this court can issue a supervisory writ.[121] I strongly disagree with the majority opinion.
¶ 513. The purpose of the supervisory writ sought by the Special Prosecutor is to provide for "the direct control of. . . judicial officers who fail to fulfill non-discretionary duties, causing harm that cannot he remedied through the appellate review process."[122]
¶ 514. The John Doe judge had a non-discretionary legal duty in the instant case to correctly interpret Wisconsin's campaign finance statutes to determine whether and how they address coordination between a candidate or candidate's campaign committee and a 501(c) nonprofit entity engaged in issue advocacy. For the reasons set forth in my dissent to the original action, I conclude that the John Doe judge *240 violated this nondiscretionary legal duty by misinterpreting and misapplying the law.[123]
¶ 515. A decision of a John Doe judge can be reviewed only by means of a supervisory writ. A decision of a John Doe judge cannot be reviewed by direct appeal. Because the John Doe judge "failfed] to fulfill [a] non-discretionary dut[y], causing harm that cannot be remedied through the appellate review process," I would grant the Special Prosecutor's writ petition.
¶ 516. In contrast, the majority opinion reaches the perplexing conclusion that although the foundation of the entire legal system rests on a judge's obligation to correctly interpret and apply the law, the John Doe judge's obligation to correctly interpret and apply the law is not the type of plain legal duty contemplated by the supervisory writ procedure. In reaching this conclusion, the majority opinion relies on a single conclusory sentence (devoid of citation to any authority) that appears in State ex rel. Kalal v. Circuit Court, 2004 WI 581, ¶ 24, 271 Wis. 2d 633, 681 N.W.2d 110.
¶ 517. In Kalal, a supervisory writ case, the petitioner argued that judges have a plain legal duty to correctly find the facts and apply the law.[124] The Kalal court declared that it could not accept this proposition "as it would extend supervisory jurisdiction to a virtually unlimited range of decisions involving the finding of facts and application of law."[125] The Kalal court explained its position as follows:
*241 The obligation of judges to correctly apply the law is general and implicit in the entire structure of our legal system. The supervisory writ, however, serves a narrow function: to provide for the direct control of lower courts, judges, and other judicial officers who fail to fulfill non-discretionary duties, causing harm that cannot be remedied through the appellate review process. To adopt the Ratals' interpretation of the plain duty requirement in supervisory writ procedure would transform the writ into an all-purpose alternative to the appellate review process,[126]
¶ 518. The majority opinion takes this discussion in Kalal out of context, reading it without any meaningful understanding of precedent or the nature of review by supervisory writ of a John Doe judge's order. Indeed, the majority opinion's interpretation of Kalal is so overbroad that Kalal and the majority opinion are reduced to balderdash.
¶ 519. To understand Kalal and the plain legal duty criterion in supervisory writ cases, one must harken back to the classic expression of what constitutes a plain legal duty and then trace the evolution of the concept in the context of supervisory writ procedure. Kalal must be read and understood in historical context, in light of supervisory writ cases preceding and subsequent to Kalal, and in recognition of a court's discretion to grant or deny a requested supervisory writ.
¶ 520. The classic articulation of the plain legal duty concept was set forth in In re Petition of Pierce-Arrow Motor Car Co., 143 Wis. 282, 127 N.W. 998 (1910). In Pierce-Arrow, the defendant sought to vacate service of a summons. The defendant requested that this court exercise its "general superintending control *242 over all inferior courts" under Article VII, Section 3 of the Wisconsin Constitution.[127]
¶ 521. The Pierce-Arrow court concluded that the legal validity of service "may well admit of different opinions by equally able legal minds."[128] The court determined that because the legal question of whether service was valid was debatable, the circuit court had not violated a plain legal duty.
¶ 522. The Pierce-Arrow court explained:
One of the cardinal rules is that the duty of the court below must be plain. The situation must be such that hardly more than a statement of the facts is necessary to convince the legal mind as to the duty of the court. Where there is no such clear and obvious duty, based either upon common-law principles or upon express statute, but where questions of law or fact or both are involved of such difficulty that "a judge may reasonably, proceeding considerately, commit judicial error," the court will refuse to intervene under its power of superintending control, but will leave the parties to their remedy by appeal.[129]
*243 ¶ 523. Pierce-Arrow represented the court's view of the plain legal duty criterion for the issuance of a supervisory writ up to 1921.[130] Thereafter, the court's view of what constitutes a plain legal duty changed significantly.[131]
¶ 524. In 1921, the court decided In re Inland Steel Co., 174 Wis. 140, 182 N.W. 917 (1921). In 1932, the court decided State ex rel. Hustisford Light, Power & Manufacturing Co. v. Grimm, 208 Wis. 366, 370-71, 243 N.W. 763 (1932). In these two cases, the court concluded that even though the question of law presented may be subject to reasonable debate, the court may exercise its original and supervisory power when an appeal would not provide an adequate remedy.
¶ 525. These cases make the following point clear: "[T]he fact that the duty of the trial court in the premises can only be determined by a careful consideration of the facts and the law applicable to the situation is no barrier to the exercise of th[e supervisory writ] power."[132]
1 526. In 1941, Justice John D. Wickhem, who served on the Wisconsin Supreme Court from 1930 to 1949, explained the developing case law on the concept of plain legal duty as follows:
*244 The purpose of this [supervisory writ] jurisdiction is to protect the legal rights of a litigant when the ordinary processes of action, appeal and review are inadequate to meet the situation, and where there is need for such intervention to avoid grave hardship or complete denial of these rights.
The later cases hold that an exercise of the court's superintending control may be justified in spite of the fact that a determination of the duty of the inferior court and the scope of the petitioner's rights may present difficult and close questions of law.[133]
¶ 527. A supervisory writ has been issued in numerous cases in which a ruling of a judge or a circuit court interpreting a statute was challenged as erroneous — even though the proper interpretation of the statute was not plain or raised a novel question— and either no appeal was permitted or appellate review would have come too late for effective redress.[134]
¶ 528. For example, in a recent case entitled Madison Metropolitan School District v. Circuit Court, 2011 WI 72, 336 Wis. 2d 95, 800 N.W.2d 442, the court of appeals transformed an appeal into a supervisory writ. The issue before the court of appeals was whether the circuit court had exceeded its authority by interpreting the applicable statutes as allowing a circuit court to direct a school district to provide a child with alternative educational services.[135]
*245 ¶ 529. The circuit court contended in Madison Metropolitan School District that the supervisory writ should be denied, arguing that "its duty was not plain, because it was faced with a novel question of law requiring harmonization of several statutory provisions."[136] In contrast, the school district argued that a supervisory writ should be granted because "the circuit court did not have authority, express or implied, to order" the school district to provide the child with alternative educational services.[137] The court of appeals sided with the school district, granting the writ.
¶ 530. This court spent 34 paragraphs (13 pages in the Wisconsin Reports) analyzing and interpreting the statutes at issue in order to determine the powers of the circuit court and school district. Obviously, the meaning of the statutes was not plain; the case presented a novel issue of law. Nevertheless, after a lengthy statutory analysis, this court affirmed the court of appeals decision granting the writ.
¶ 531. In deciding that a supervisory writ was warranted, the Madison Metropolitan School District court explained that "the circuit court's duty was plain: to keep within the scope of its statutory authority."[138] It then continued: "Because we have concluded that the circuit court's duty to keep within the bounds of its lawful authority was plain, its violation of that duty was clear when it ordered the District to provide educational resources . . . ."[139]
*246 ¶ 532. Notably, Kalal was never mentioned in the majority opinion in Madison Metropolitan School District, although the court was well aware of Kalal. Kalal was argued in the briefs and in the dissent.
¶ 533. Madison Metropolitan School District and numerous other cases teach that Kalal does not mean that a supervisory writ cannot issue when a case presents a difficult or close question of law. Rather, Kalal is best understood as demonstrating that a reviewing court has discretion whether to issue a supervisory writ, even when the trial court or judge under review violated a plain legal duty. The reviewing court considers several factors and equitable principles in deciding whether to issue a supervisory writ.[140]
¶ 534. Indeed, in an opinion issued just one year before Kalal (and authored by then-justice Sykes, who wrote Kalal), this court stated in no uncertain terms that a court's decision to issue a supervisory writ "is a discretionary determination that is reviewed for an erroneous exercise of that discretion."[141]
¶ 535. Thus, properly understood, Kalal involved a discretionary call. Kalal does not support the majority opinion's view that a supervisory writ cannot be issued when the legal issue presented is subject to reasonable debate.
*247 ¶ 536. If this court's interpretation of the applicable statutes differs from that of the John Doe judge (that is, if the John Doe judge misinterpreted the law), then the John Doe judge erroneously exercised his discretion in issuing the January 10, 2014, order, and a supervisory writ is appropriate. Two examples illustrate this point.
¶ 537. Example 1. If the John Doe judge's order was based on an erroneous view of Chapter 11 or the First Amendment but is not reviewed by this court, no further review occurs and both the Special Prosecutor and the public at large are deprived of the enforcement of statutes intended to protect the integrity of Wisconsin's elections. This result amounts to a virtual nullification of a duly enacted law and imposes a serious hardship on the people of this state.
¶ 538. Example 2. If the John Doe judge had ruled in favor of the Special Prosecutor and the John Doe proceedings continued, then unless a supervisory writ were available to the Unnamed Movants, they could not challenge the John Doe judge's ruling until criminal charges were filed. Such a situation, Unnamed Movants 6 and 7 would surely claim, would impose a serious hardship on them.
¶ 539. In sum, a supervisory writ is the proper procedure for correcting a John Doe judge's erroneous application of the law when an appeal is not available or would come too late for effective redress.[142] The majority opinion errs in holding otherwise.
¶ 540. For the reasons set forth, I conclude that the court should decide whether the John Doe judge's January 10, 2014, order was based on a misinterpre *248 tation of Wisconsin's campaign finance statutes. Because I conclude that it was, I further conclude that the Special Prosecutor has met the criteria for the issuance of a supervisory writ. I would grant the writ petition.
¶ 541. Accordingly, I dissent.
Nos. 2013AP2504-W through 2013AP2508-W: Supervisory Writ & Review State of Wisconsin ex rel. Three Unnamed Petitioners v. Gregory A. Peterson, John Doe Judge; Gregory Potter, Chief Judge;[143] and Francis D. Schmitz, as Special Prosecutor
¶ 542. In this third case, the final case in the John Doe trilogy, Unnamed Movants 2, 6, and 7 seek review of an opinion and order of the court of appeals that denied the three Unnamed Movants' petition for supervisory writs of mandamus and prohibition. The respondents are the John Doe judge, the chief judges of the counties in which the cases are underway, and the Special Prosecutor.
¶ 543. In their petition to the court of appeals seeking supervisory writs, the three Unnamed Movants alleged, in relevant part, the following errors of law in the John Doe proceedings:
(1) The multi-county nature of the John Doe investigation is contrary to Wisconsin law.
(2) The John Doe judge had no authority to appoint the Special Prosecutor without satisfying the criteria set forth in Wis. Stat. § 978.045(lr).
(3) The John Doe Judge had no authority to appoint a special prosecutor to act in multiple counties.
*249 ¶ 544. These allegations raise multiple overlapping questions of law regarding the procedural validity of the Special Prosecutor's appointment, the competency of the Special Prosecutor to conduct the John Doe investigation, and the legitimacy of a multi-county John Doe investigation under Wisconsin law.
¶ 545. The court of appeals rejected the arguments of the three Unnamed Movants and denied their writ petition. The majority opinion affirms the court of appeals order denying the writ petition. The petition for review in this court did not raise all the issues raised before the court of appeals or all the issues this court raised in its December 16, 2014, order (attached hereto as Exhibit A). I agree with the majority opinion that the court of appeals order should be affirmed. I reach this result, however, using significantly different reasoning than the majority opinion.
¶ 546. The majority opinion concludes that the John Doe judge's obligation to "correctly find facts and apply the law is not the type of plain legal duty contemplated by the supervisory writ procedure ... ."[144] Because the majority opinion determines that the three Unnamed Movants have failed to fulfill the plain legal duty criterion, it declares that they have failed to "satisfy the stringent preconditions for a supervisory writ."[145]
¶ 547. The majority opinion's discussion of the plain legal duty criterion is reminiscent of its analysis in the second case in the John Doe trilogy.[146] For the reasons set forth in my dissent in the second case in *250 the John Doe trilogy (see ¶¶ 498-521, supra), I take issue with the majority opinion's explanation and application of the plain legal duty concept. I will not repeat that discussion here.
¶ 548. I conclude that the court of appeals was required to interpret and apply the applicable law to determine whether the John Doe judge had violated a plain legal duty. The court of appeals had discretion, however, whether to grant or deny the three Unnamed Movants' writ petition.
¶ 549. I consider whether the court of appeals properly exercised its discretion in denying the Unnamed Movants' writ petition by correctly interpreting and applying the applicable law.[147] I decide the underlying legal questions faced by the court of appeals independently, but benefit from the court of appeals' analysis.[148]
¶ 550. In determining that there were no procedural defects in the John Doe proceedings and thus that a supervisory writ was not warranted, the court of appeals relied on established case law, including State v. Cummings, 199 Wis. 2d 721, 546 N.W.2d 406 (1996); State v. Carlson, 2002 WI App 44, 250 Wis. 2d 562, 641 N.W.2d 451; State ex rel. Friedrich v. Circuit Court, 192 Wis. 2d 1, 531 N.W.2d 32 (1995); and State v. Bollig, 222 Wis. 2d 558, 587 N.W.2d 908 (Ct. App 1998)). These cases are persuasive.
*251 ¶ 551. I conclude that the court of appeals correctly decided the questions of law presented in the three Unnamed Movants' writ petition as follows:
(1) The initiation of multiple, parallel John Doe proceedings related to a single criminal investigation is permitted under Wisconsin law. This is an effective and efficient way of proceeding.
(2) The John Doe judge did not rely on Wis. Stat. § 978.045(lr) to appoint the Special Prosecutor. Rather, the John Doe judge made the appointment pursuant to inherent judicial authority. The John Doe judge had such authority regardless of whether the statutory conditions set forth in Wis. Stat. § 978.045(lr) were met. Case law makes clear that a John Doe judge's powers extend beyond the powers conferred by statute to include all powers necessary to conduct the John Doe investigatory proceeding.[149]
*252 (3) The John Doe judge issued five separate orders appointing the Special Prosecutor, one for each county's John Doe proceeding. The same prosecutor may serve multiple appointments in related proceedings. Thus, a John Doe judge may lawfully appoint the same special prosecutor to proceedings underway in several counties. This is an effective and efficient way of proceeding.
(4) Even if there were procedural errors in the Special Prosecutor's appointment (and I do not believe there were), the Special Prosecutor has competency to proceed.[150]
¶ 552. The court of appeals was not presented with argument regarding the procedural validity of the John Doe judge's appointment and the competency of the John Doe judge to conduct the John Doe proceedings. That argument was, however, advanced in this *253 court. It is without merit, as the majority opinion makes clear.[151]
¶ 553. Because the court of appeals properly interpreted and applied the applicable law, I conclude that it did not erroneously exercise its discretion in denying the three Unnamed Movants' writ petition. The court of appeals decision should be affirmed.
¶ 554. In closing, I note that even if this court determined that the John Doe proceedings were procedurally defective and that a supervisory writ is warranted, only those Unnamed Movants who raised the objection before the John Doe judge may be entitled to any relief. If not raised, these objections were waived (forfeited). See Village of Trempealeau v. Mikrut, 2004 WI 79, ¶ 27, 273 Wis. 2d 76, 681 N.W.2d 190 (stating that "the common-law waiver [forfeiture] rule applies to challenges to the circuit court's competency" and explaining that a competency challenge is waived as a matter of right if raised for the first time on appeal); In re Commitment of Bollig, 222 Wis. 2d 558, 564, 587 N.W.2d 908 (Ct. App. 1998) (providing that a defect in the appointment of a special prosecutor is waived (forfeited) if raised for the first time on appeal).
¶ 555. For the reasons set forth, I write separately.
*254 [[Image here]]
*255 [[Image here]]
*256 [[Image here]]
*257 [[Image here]]
*258 [[Image here]]
*259 [[Image here]]
*260 [[Image here]]
*261 [[Image here]]
*262 [[Image here]]
*263 [[Image here]]
*264 [[Image here]]
*265 [[Image here]]
*266 [[Image here]]
*267 [[Image here]]
*268 [[Image here]]
*269 [[Image here]]
*270 [[Image here]]
*271 [[Image here]]
*272 [[Image here]]
*273 [[Image here]]
*274 [[Image here]]
*275 [[Image here]]
*276 [[Image here]]
*277 [[Image here]]
*278 [[Image here]]
*279 [[Image here]]
*280 [[Image here]]
*281 [[Image here]]
*282 [[Image here]]
*283 [[Image here]]
*284 [[Image here]]
*285 [[Image here]]
*286 [[Image here]]
*287 [[Image here]]
*288 [[Image here]]
*289 [[Image here]]
*290 [[Image here]]
*291 [[Image here]]
*292 [[Image here]]
*293 [[Image here]]
*294 [[Image here]]
*295 [[Image here]]
*296 [[Image here]]
*297 [[Image here]]
*298 [[Image here]]
*299 [[Image here]]
*300 [[Image here]]
*301 [[Image here]]
*302 [[Image here]]
*303 [[Image here]]
*304 [[Image here]]
*305 [[Image here]]
*306 [[Image here]]
*307 [[Image here]]
*308 [[Image here]]
*309 [[Image here]]
*310 [[Image here]]
*311 [[Image here]]
*312 [[Image here]]
*313 [[Image here]]
*314 [[Image here]]
*315 [[Image here]]
*316 [[Image here]]
*317 [[Image here]]
*318 [[Image here]]
*319 [[Image here]]
*320 [[Image here]]
*321 [[Image here]]
*322 [[Image here]]
*323 [[Image here]]
*324 [[Image here]]
*325 [[Image here]]
*326 [[Image here]]
*327 [[Image here]]
*328 [[Image here]]
*329 [[Image here]]
*330 [[Image here]]
*331 [[Image here]]
*332 [[Image here]]
*333 [[Image here]]
*334 [[Image here]]
*335 [[Image here]]
*336 [[Image here]]
*337 [[Image here]]
*338 [[Image here]]
*339 N. PATRICK CROOKS, J.
¶ 556. {concurring in part, dissenting in part). The United States Supreme Court has recently acknowledged that "Judges are not politicians, even when they come to the bench by way of the ballot." Williams-Yulee v. Florida Bar, 135 S. Ct. 1656, 1662 (2015). Williams-Yulee involved whether a judicial conduct rule prohibiting judicial candidates from personally soliciting campaign funds violated the First Amendment to the United States Constitution. Id. In concluding that the First Amendment permits the particular regulation of speech at issue, the Supreme Court stressed:
In deciding cases, a judge is not to follow the preferences of his supporters, or provide any special consideration to his campaign donors. A judge instead must "observe the utmost fairness," striving to be "perfectly and completely independent, with nothing to influence or controul him but God and his conscience."
Id. at 1667 (citing Address of John Marshall, in Proceedings and Debates of the Virginia State Convention of 1829-1830, p. 616 (1830)).
¶ 557. These principles must serve as guideposts for all of us as judges in the courts of Wisconsin, whether or not the case or cases at issue involve significant political overtones, as these John Doe cases do.
¶ 558. It is with these important tenets in mind that I write separately.
¶ 559. By erroneously concluding that campaign committees do not have a duty under Wisconsin's campaign-finance law, Wis. Stat. Ch. 11 (2011-12),[1] to report receipt of in-kind contributions in the form of *340 coordinated spending on issue advocacy,[2] the majority rejects the special prosecutor's primary argument regarding criminal activity. Although the special prosecutor advances a secondary argument of criminal activity concerning coordinated express advocacy, the majority inexplicably ignores that argument. These mistakes lead the majority to terminate a valid John Doe[3] investigation in an unprecedented fashion.
¶ 560. With respect to the special prosecutor's primary argument, which is the focus of my writing, the majority misapplies the related doctrines of over-breadth and vagueness. Unlike the majority, I conclude that Wis. Stat. § 11.06(1) is neither overbroad nor vague in its requirement that campaign committees report receipt of in-kind contributions. The majority also makes the troubling pronouncement that an act is not a regulable disbursement or contribution under Chapter 11 unless it involves express advocacy or its functional equivalent. This is an erosion of Chapter 11 that will profoundly affect the integrity of our electoral process. I cannot agree with this result.
¶ 561. It is also imperative to note that the majority conveniently overlooks the special prosecutor's secondary argument of criminal activity in its *341 effort to end this John Doe investigation. Specifically, the special prosecutor seeks to investigate whether particular express advocacy groups coordinated their spending with candidates or candidate committees in violation of their sworn statement of independence under Wis. Stat. § 11.06(7). Despite the fact that the special prosecutor utilizes a significant portion of his brief to present evidence of such illegal coordination, the majority determines, without explanation, that the John Doe investigation is over.
¶ 562. Has the majority abused its power in reaching this conclusion? The majority's rush to terminate this investigation is reminiscent of the action taken by the United States District Court for the Eastern District of Wisconsin in O'Keefe v. Schmitz, 19 F. Supp. 3d 861 (E.D. Wis.) order clarified, No. 14-C-139, 2014 WL 2446316 (E.D. Wis. May 30, 2014) (O'Keefe v. Schmitz), an action that was both criticized and reversed by the United States Court of Appeals for the Seventh Circuit in O'Keefe v. Chisholm, 769 F.3d 936 (7th Cir. 2014) cert. denied, No. 14-872, 2015 WL 260296 (U.S. May 18, 2015). Although the focus of my writing lies elsewhere, the majority's error in this regard cannot be overlooked.
¶ 563. For these reasons, I respectfully dissent in State ex. rel. Two Unnamed Petitioners v. Peterson (Two Unnamed Petitioners).
¶ 564. However, like the majority, I conclude that the special prosecutor and certain Unnamed Movants have failed to meet their heavy burden of establishing that the John Doe judge violated a plain legal duty in either initiating these proceedings or quashing various subpoenas and search warrants related to the investigation. Accordingly, I concur with the majority in State ex. rel. Schmitz v. Peterson (Schmitz v. Peterson) and *342 State ex. rel. Three Unnamed Petitioners v. Peterson (Three Unnamed Petitioners). In concurring in Schmitz v. Peterson, it is significant for me that when an appellate court decides to issue a supervisory writ, it is a rare, discretionary decision. Madison Metro. Sch. Dist. v. Circuit Ct. for Dane Cnty., 2011 WI 72, ¶¶ 33-34, 336 Wis. 2d 95, 800 N.W.2d 442. Here, the John Doe judge also made a discretionary decision in deciding a complex legal issue. Deference should be given where there is such discretion.
¶ 565. The John Doe ihvestigation should not be terminated because the special prosecutor's primary argument regarding criminal activity is supported by Chapter 11, and the United States Supreme Court has not concluded that the First Amendment to the United States Constitution prohibits the type of regulation underlying that argument. See O'Keefe, 769 F.3d at 942.[4] The special prosecutor seeks to investigate whether certain campaign committees failed to comply with their statutory obligation to report receipt of in-kind contributions (in the form of coordinated spending on issue advocacy) in connection with various *343 recall elections. A campaign committee's duty to report such in-kind contributions is prescribed by Wis. Stat. § 11.06(1).[5]
¶ 566. In Two Unnamed Petitioners, the majority holds that the special prosecutor fails to advance a valid argument under Wisconsin criminal law and rashly closes the John Doe investigation. In reaching its conclusion, the majority does not confront the plain language of Wis. Stat. § 11.06(1). Instead, it focuses more generally on Chapter ll's definition of "political purposes," because in its view, "If an act is not done for political purposes, then it is not a disbursement or a contribution, and it therefore is not subject to regulation under Ch. 11. "[6]
¶ 567. The majority determines that the definition of "political purposes" in Wis. Stat. § 11.01(16) is unconstitutionally overbroad and vague regardless of the context in which it applies to regulate political speech under Chapter ll.[7] This is so, the majority reasons, primarily because the definition encompasses an act done "for the purpose of influencing" an election.[8] To support the notion that the phrase "for the purpose of influencing" an election is hopelessly over-broad and vague, even where it operates to regulate campaign contributions, the majority purports to borrow pages from Buckley v. Valeo, 424 U.S. 1 (1976), and *344 Wis. Right to Life, Inc. v. Barland, 751 F.3d 804 (7th Cir. 2014) (Barland II). It then applies a narrowing construction to § 11.01(16) to confine the definition of "political purposes" to express advocacy or its functional equivalent, because that construction is " 'readily available' due to the Seventh Circuit's decision in Borland II."[9] The upshot, according to the majority, is that an act is not a regulable disbursement or contribution under Chapter 11 unless it involves express advocacy or its functional equivalent.[10]
¶ 568. Turning to the special prosecutor's arguments regarding criminal activity, the majority summarily concludes: "The limiting construction that we apply makes clear that the special prosecutor's theories are unsupportable in law given that the theories rely on overbroad and vague statutes."[11] The majority must therefore dismiss the special prosecutor's in-kind contribution argument on the basis that Wis. Stat. § 11.06(1) contains the terms "contribution" and "disbursement," thereby triggering the definition of "political purposes." It follows, according to the majority's logic, that § 11.06(1) is unconstitutionally overbroad and vague unless its reach is limited to express advocacy or its functional equivalent. Since the special prosecutor's in-kind contribution argument relies on coordinated issue advocacy, not express advocacy, the majority swiftly rejects that argument.[12]
*345 f 569. As previously mentioned, I conclude that Wis. Stat. § 11.06(1) is neither overbroad nor vague in its requirement that campaign committees report receipt of in-kind contributions. I recognize that under the special prosecutor's argument a reportable in-kind contribution requires a "political purpose," thus implicating the phrase "for the purpose of influencing" an election that the majority finds so troubling. However, in Buckley, the United States Supreme Court indicated that this phrase is hardly problematic "in connection with the definition of a contribution because of the limiting connotation created by the general understanding of what constitutes a political contribution." Buckley, 424 U.S. at 23 n.24. In other words, it is common sense — not the retention of a campaign-finance attorney — that tells people of ordinary intelligence what is and is not a campaign contribution.
¶ 570. The majority disregards this important language in Buckley, opting instead to justify its over-breadth and vagueness determination with the Supreme Court's discussion of the phrase "for the purpose of influencing" an election in a completely different context: the regulation of independent political expenditures. The majority's failure to perform a context specific analysis of the subject phrase in reaching its blanket conclusion that Chapter ll's definition of "political purposes" is overbroad and vague represents a fundamental misunderstanding of Buckley and its progeny, including Barland II. It further ignores the principle that "The First Amendment vagueness and overbreadth calculus must be calibrated to the kind *346 and degree of the burdens imposed on those who must comply with the regulatory scheme. The greater the burden on the regulated class, the more acute the need for clarity and precision." Barland II, 751 F.3d at 837.
¶ 571. The majority's errors in Two Unnamed Petitioners (including its failure to address Wis. Stat. § 11.06(1) in rejecting the special prosecutor's in-kind contribution argument) serve to terminate a valid John Doe investigation. They also work to limit the reach of Wisconsin's campaign-finance law in a manner that will undermine the integrity of our electoral process. I disagree with these consequences.
I. TWO UNNAMED PETITIONERS (ORIGINAL ACTION)
¶ 572. To support my position that the John Doe investigation should move forward because the special prosecutor advances a valid argument under Wisconsin criminal law, I begin by identifying the relevant portions of Chapter 11 that support that argument. Next, I discuss some important principles pertaining to the related doctrines of overbreadth and vagueness, as well as significant campaign-finance law decisions embodying those principles. These general principles and decisions lead me to determine that there are no overbreadth and vagueness concerns with respect to the statute that supports the special prosecutor's primary argument regarding criminal activity. Finally, I discuss the question of whether the First Amendment to the United States Constitution forbids regulation of coordinated issue advocacy between a candidate or a campaign committee and an issue advocacy group. I conclude that the absence of Supreme Court precedent regarding an issue that has sparked "lively debate *347 among judges and academic analysts"[13] is an important factor as to why this John Doe investigation should not be terminated.
A. Under Chapter 11, a Campaign Committee Must Report its Receipt of In-Kind Contributions in the Form of Coordinated Spending on Issue Advocacy.
¶ 573. In the special prosecutor's own words, the "non-disclosure of reportable campaign contributions is at the heart of this [John Doe] investigation." The following illustrates the special prosecutor's in-kind contribution argument:
X is a nonprofit corporation that engages in political speech on issues of public importance. Y is a campaign committee[14] regulated under Ch. 11 . When X spends money on issue advocacy, it does not operate independently ofY. Rather, X coordinates its spending with Y, such that Y may be involved in the timing, content, or placement of issue advocacy that is made for its benefit. Y has received an in-kind contribution that must be reported under Chapter ll.[15]
*348 ¶ 574. The special prosecutor's in-kind contribution argument is rooted in Wis. Stat. § 11.06. That section, entitled "Financial report information; application; funding procedure," generally requires Chapter 11 registrants[16] to "make full reports ... of all contributions received, contributions or disbursements made, and obligations incurred." Wis. Stat. § 11.06(1) (emphasis added). Candidates and their campaign committees have an absolute duty to register with the Government Accountability Board (GAB) under Wis. Stat. § 11.05(2g), so there appears to be no question that the general reporting obligations prescribed by § 11.06(1) apply to those entities.
¶ 575. The term "contribution" is defined by Wis. Stat. § 11.01(6)(a). It includes "A gift, subscription, loan, advance, or deposit of money or anything of value . . . made for political purposes." Wis. Stat. § 11.01(6)(a)l. The definition encompasses contributions that are received in cash, i.e., a "gift... of money," and those that are received "in kind," i.e., "anything of value." See Wis. Coal. for Voter Participation, Inc. v. State Elections Bd., 231 Wis. 2d 670, 680, 605 N.W.2d 654 (Ct. App. 1999) (WCVP). Wisconsin Admin. Code § GAB 1.20(l)(e) defines an "in-kind contribution" as "a disbursement by a contributor to procure a thing of value or service for the benefit of a registrant who authorized the disbursement." To constitute a cash or in-kind contribution, money must be given or spent for "political purposes," which is defined *349 by Wis. Stat. § 11.01(16) to include an act done "for the purpose of influencing" an election.
¶ 576. Reading the above definitions in conjunction with Wis. Stat. § 11.06(1), it is clear that a campaign committee has a duty to report its receipt of cash as contributions. It is equally clear that a campaign committee has a duty to report its receipt of services as contributions if it authorizes a third party to pay for those services for the benefit of the campaign.
¶ 577. But what if a campaign committee does not necessarily authorize or control a third party's spending on services for the campaign’s benefit, but instead prearranges that spending with the third party? Chapter 11 instructs that under these circumstances a candidate committee has received a reportable contribution as well. See Wis. Stat. § 11.06(4)(d) ("A . . . disbursement. . . made . . . for the benefit of a candidate is reportable by the candidate or the candidate's personal campaign committee if it is made or incurred with the authorization, direction or control of or otherwise by prearrangement with the candidate or the candidate's agent.") (emphasis added).
¶ 578. As the foregoing discussion demonstrates, under Chapter 11, "contributions to a candidate's campaign must be reported whether or not they constitute express advocacy." WCVP, 231 Wis. 2d at 679 (emphasis in original). There is nothing in the plain language of Wis. Stat. § 11.06(1), § 11.01(6)(a)l, § 11.06(4)(d), or Wis. Admin. Code § GAB 1.20(l)(e) that limits receipt of reportable contributions to express advocacy or its functional equivalent.
¶ 579. Returning to the illustration of the special prosecutor's in-kind contribution argument, it is evident that Chapter 11 supports that argument in one of *350 two ways. First, Y, the campaign committee, may have received a reportable in-kind contribution if the nature of its coordination with X is such that Y authorized or controlled X's spending on issue advocacy. Second, Y may have received a reportable in-kind contribution if the nature of its coordination with X is such that the two entities prearranged X's spending on issue advocacy.
¶ 580. Thus, absent the majority's limiting construction that confines the term "contribution" to express advocacy or its function equivalent, the special prosecutor makes a valid argument under Wisconsin criminal law.[17]
B. The Key Inquiry in First Amendment Overbreadth and Vagueness Analysis is Whether the Statute at Issue Reaches a Substantial Amount of Constitutionally Protected Activity.
¶ 581. Having identified the portions of Chapter 11 that support the special prosecutor's in-kind contribution argument, I turn to the related doctrines of overbreadth and vagueness to highlight some important principles that the majority opinion overlooks. I also examine relevant campaign-finance decisions that embody those principles.
i. Overbreadth and Vagueness
¶ 582. "According to our First Amendment over-breadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech." *351 United States v. Williams, 553 U.S. 285, 292 (2008) (emphasis added). The Supreme Court in Williams explained:
The doctrine seeks to strike a balance between competing social costs. On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas. On the other hand, invalidating a law that in some of its applications is perfectly constitutional — particularly a law directed at conduct so antisocial that it has been made criminal —has obvious harmful effects. In order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep. Invalidation for overbreadth is strong medicine that is not to be casually employed.
Id. (emphasis added) (internal citations and quotations omitted). When engaging in overbreadth analysis, a court's first step "is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." Id. at 293 (emphasis added). Once a court interprets the statute at issue, the second step is to determine whether it "criminalizes a substantial amount of protected expressive activity." Id. at 297.
¶ 583. "Like the overbreadth doctrine, the void-for-vagueness doctrine protects against the ills of a law that 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" Ctr. for Individual Freedom v. Madigan, 697 F.3d 464, 478-79 (7th Cir. 2012) (quoted source and citation omitted). Where the statute at *352 issue implicates First Amendment rights, a greater degree of precision and guidance is required. Id. at 479; see also Buckley, 424 U.S. at 77 ("Where First Amendment rights are involved, an even 'greater degree of specificity' is required.") (quoted source and citation omitted). That said, " 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" Williams, 553 U.S. at 304 (quoted source and citation omitted). Similar to overbreadth analysis, a court engaging in First Amendment vagueness analysis must interpret the statute at issue and determine whether it restricts a substantial amount of constitutionally protected activity. Madigan, 697 F.3d at 479. If it does not, a facial challenge to the statute must fail. Id.
¶ 584. The takeaway is that "The First Amendment vagueness and overbreadth calculus must be calibrated to the kind and degree of the burdens imposed on those who must comply with the regulatory scheme. The greater the burden on the regulated class, the more acute the need for clarity and precision." Barland II, 751 F.3d at 837.
ii. Relevant Campaign-Finance Decisions
¶ 585. That First Amendment overbreadth and vagueness analysis is context specific is best exemplified by Buckley, the case in which the United States Supreme Court created the express-advocacy limitation that is at the heart of this case. In Buckley, the Supreme Court considered various challenges to the Federal Election Campaign Act of 1971's (FECA) restrictions on contributions and independent expenditures. The main provisions under review involved: (1) limitations on individual and group political contributions; (2) limitations on independent expenditures; *353 and (3) disclosure requirements for individual and group political contributions and independent expenditures. Buckley, 424 U.S. at 7.
¶ 586. Prior to addressing the subject enactments, Buckley discussed the kind and degree of burdens imposed on political speakers through limitations on the giving and spending of money in political campaigns. Regarding limitations on contributions, the Supreme Court explained:
a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication. A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support .... A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues.
Id. at 20-21 (emphasis added). In comparison, limitations on independent expenditures "represent substantial rather than merely theoretical restraints on the quantity and diversity of political speech." Id. at 19. This is because "A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." Id.
¶ 587. Bearing in mind the relative burdens on political speech imposed by limitations on contribu *354 tions and independent expenditures, the Supreme Court turned to address constitutional challenges to FECA's $1,000 limitation on individual and group political contributions to any single candidate per election. Under FECA, the term "contribution" was defined to include "a gift, subscription, loan, advance, or deposit of money or anything of value . . . made for the purpose of influencing" an election. Id. at 182. The appellants did not challenge the subject enactment as unconstitutionally overbroad and vague on the basis that it incorporated the phrase "for the purpose of influencing" an election. However, in a footnote, Buckley all but assured that the phrase poses little over-breadth and vagueness concerns in the context of regulating contributions:
The Act does not define the phrase "for the purpose of influencing" an election that determines when a gift, loan, or advance constitutes a contribution. Other courts have given that phrase a narrow meaning to alleviate various problems in other contexts.. . . The use of the phrase presents fewer problems in connection with the definition of a contribution because of the limiting connotation created by the general understanding of what constitutes a political contribution.
Id. at 23 n.24 (internal citations omitted).
¶ 588. Given the Supreme Court's recognition that limitations on contributions impose marginal burdens on free speech, its decision not to require a more precise definition of the term "contribution" is entirely consistent with the context specific inquiry that must take place when engaging in overbreadth and vagueness analysis. Ultimately, Buckley upheld FECA's limitation on individual and group political contributions, finding a "sufficiently important inter *355 est" in preventing quid pro quo corruption or the appearance thereof. Id. at 25-28.
¶ 589. The Supreme Court then considered FE-CA's $1,000 limitation on independent expenditures "relative to a clearly identified candidate." Id. at 39. In that context, the appellants successfully asserted a vagueness challenge to the subject enactment's use of the above quoted phrase. Significant to the Supreme Court's determination was the fact that the limitation on independent expenditures posed a substantial burden on political speech. See id. at 39-44. It reasoned that the indefiniteness of the phrase "relative to a clearly identified candidate" "fails to clearly mark the boundary between permissible and impermissible speech . . . ." Id. at 41. Thus, it searched for a narrowing construction to save the statute from unconstitutionality.
¶ 590. The Supreme Court found that narrowing construction in the text of the subject enactment itself:
The section prohibits any expenditure ... relative to a clearly identified candidate during a calendar year which, when added to all other expenditures . . . advocating the election or defeat of such candidate, exceeds, $1,000. This context clearly permits, if indeed it does not require, the phrase "relative to" a candidate to he read to mean "advocating the election or defeat of1 a candidate.
Id. at 42 (internal quotations omitted). It then determined that the readily apparent limiting construction simply "refocuse[d] the vagueness question," Id., "[f]or the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application." Id. As a result, the Supreme Court further narrowed FECA's *356 limitation on independent expenditures to "expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." Id. at 44.
¶ 591. The express advocacy limitation created in Buckley was therefore "an endpoint of statutory interpretation, not a first principle of constitutional law." McConnell v. Fed. Election Comm'n, 540 U.S. 93, 190 (2003), overruled on other grounds by Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010). Ultimately, the Supreme Court determined that FE-CA's limitation on independent expenditures, even as narrowly construed, impermissibly burdened the constitutional right of free expression. Buckley, 424 U.S. at 47-51.
¶ 592. Perhaps most significant for purposes of the instant action is Buckley's discussion of FECA's disclosure requirements for contributions and independent expenditures. The enactment at issue imposed reporting obligations on individuals and groups that made contributions or independent expenditures aggregating over $100 in a calendar year "other than by contribution to a political committee or candidate." Id. at 74-75.
¶ 593. FECA defined the terms "contribution" and "expenditure" to include anything of value made "for the purpose of influencing" an election. Id. at 77. This time Buckley took issue with that phrase, but only as it operated to regulate independent expenditures. Id. at 77-80.[18] To avoid overbreadth and vagueness concerns, the Supreme Court construed "expenditure" for *357 purposes of the subject enactment "to reach only funds that expressly advocate the election or defeat of a clearly identified candidate." Id. at 80. So construed, the enactment withstood constitutional scrutiny, as Buckley found disclosure to be "a reasonable and minimally restrictive method of furthering First Amendment values by opening the basic processes of our federal election system to public view." Id. at 82.
¶ 594. The foregoing discussion reveals that the majority misconstrues Buckley. Buckley's conclusion is that the phrase "for the purpose of influencing" an election poses First Amendment overbreadth and vagueness concerns in regard to independent expenditures, not contributions received.[19]
¶ 595. In the aftermath of Buckley, the Supreme Court has continued to utilize the express advocacy *358 limitation to curb FECA restrictions on independent expenditures. For example, in Fed. Election Comm'n v. Mass. Citizens for Life, Inc., 479 U.S. 238, 245-49 (1986) (MCFL), the Supreme Court applied Buckley's express advocacy limitation to FECA's prohibition on corporations using treasury funds to make independent expenditures in connection with any federal election. Tracking Buckley's overbreadth and vagueness analysis with respect to FECA's disclosure requirements on independent expenditures, the Supreme Court in MCFL determined that FECA's broad definition of the term "expenditure," i.e., anything of value made "for the purposes of influencing" an election, posed overbreadth concerns in the context of the "more intrusive provision that directly regulate [d] independent spending." Id. at 246-49. Accordingly, it held that the term "expenditure" in the subject provision was limited to communications for express advocacy. Id. at 249.
¶ 596. That Buckley's express advocacy limitation was the product of statutory interpretation designed to avoid overbreadth and vagueness concerns solely with respect to the statutory language at issue is confirmed by McConnell, 540 U.S. at 191-93. There, the Supreme Court considered challenges to the Bipartisan Campaign Reform Act of2002 (BCRA). Id. at 189. BCRA created a new term, "electioneering communication,"[20] which placed restrictions on communications *359 for express advocacy as well as issue advocacy. Id. The plaintiffs asserted constitutional challenges to the new term as it applied to both the expenditure and disclosure contexts. Id. at 190. In essence, they argued that the term "electioneering communication" must be limited to communications for express advocacy because "Buckley drew a constitutionally mandated line between express advocacy and so-called issue advocacy, and that speakers possess an inviolable First Amendment right to engage in the latter category of speech." Id.
¶ 597. McConnell patently rejected that contention, reasoning:
a plain reading of Buckley makes clear that the express advocacy limitation, in both the expenditure and the disclosure contexts, was the product of statutory interpretation rather than a constitutional command. In narrowly reading the FECA provisions in Buckley to avoid problems of vagueness and overbreadth, we nowhere suggested that a statute that was neither vague nor overbroad would be required to toe the same express advocacy line. Nor did we suggest as much in MCFL ... in which we addressed the scope of another FECA expenditure limitation and confirmed the understanding that Buckley's express advocacy category was a product of statutory construction.
In short, the concept of express advocacy and the concomitant class of magic words were born of an effort to avoid constitutional infirmities.... We have long rigidly adhered to the tenet never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied,... for [t]he nature of judicial review constrains us to consider the *360 case that is actually before us, . . . Consistent with that principle, our decisions in Buckley and MCFL were specific to the statutory language before us; they in no way drew a constitutional boundary that forever fixed the permissible scope of provisions regulating campaign-related speech.
Id. at 191-93 (emphasis added) (internal citations and quotations omitted). Thus, it would be error for a court to rely on Buckley to narrow a statute's reach to express advocacy where it does not pose the same overbreadth and vagueness concerns that drove the Supreme Court's analysis in Buckley. See id. at 194.
¶ 598. The Seventh Circuit's decision in Borland II is entirely consistent with the notion that Buckley's express advocacy limitation is context specific. There, Wisconsin Right to Life (WRTL), a nonprofit tax-exempt corporation, "sued to block enforcement of many state statutes and rules against groups that spend money for political speech independently of candidates and parties." Barland II, 751 F.3d at 807 (emphasis added). Specifically, the complaint alleged "that the challenged laws are vague and overbroad and unjustifiably burden the free-speech rights of independent political speakers in violation of the First Amendment." Id. (emphasis added). Lest there be any confusion, the Seventh Circuit specified; "Neither [WRTL] nor its state PAC contributes to candidates or other political committees, nor are they connected with candidates, their campaign committees, or political parties. That is to say, they operate independently of candidates and their campaign committees." Id. at 809.
¶ 599. So when the Seventh Circuit considered WRTL's overbreadth and vagueness challenge to Chapter ll's definition of "political purposes," it did so in the context of that term's restrictions on independent *361 expenditures, not contributions received. Any other reading contravenes the principle that courts should not "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied .. .." McConnell, 540 U.S. at 193 (citation and quotations omitted). To be clear, the GAB's concession in Borland II was that Chapter ll's definition of "political purposes" was overbroad and vague "in the sense meant by Buckley ...." Barland II, 751 F.3d at 832. As demonstrated, Buckley was concerned with the phrase "for the purpose of influencing" an election where it operated to regulate independent expenditures, not contributions. Thus, it is incorrect to rely on Barland II to support the notion that the subject phrase poses over-breadth and vagueness concerns in the context of Chapter ll's regulation of contributions received.[21]
¶ 600. In sum, the key inquiry in First Amendment overbreadth and vagueness analysis is whether the statute at issue reaches a substantial amount of constitutionally protected speech. As a result, a court's analysis in this regard must be context specific — "the greater the burden on the regulated class, the more acute the need for clarity and precision." Id. at 837. Buckley embodies that principle in its disparate treatment of contributions and independent expenditures under FECA.[22]
*362 C. There are No Overbreadth and Vagueness Concerns with Respect to Wis. Stat. § 11.06(1).
¶ 601. Wisconsin Stat. § 11.06(1) is neither over-broad nor vague in its requirement that campaign committees report receipt of in-kind contributions in the form of coordinated spending on issue advocacy.
¶ 602. As noted, the primary inquiry is whether Wis. Stat. § 11.06(1) reaches a substantial amount of constitutionally protected speech. Madigan, 697 F.3d at 479. Of course, in order to answer that question, it is necessary to examine the plain language of the statute. Williams, 553 U.S. at 293.
¶ 603. Generally speaking, Wis. Stat. § 11.06(1) requires registrants to "make full reports ... of all contributions received, contributions or disbursements made, and obligations incurred." Registrants must file frequent and detailed reports under § 11.06; Barland II summarized a variety of those reporting obligations as follows:
For contributions received in excess of $20, the report must include the date of the contribution, the name and address of the contributor, and the cumulative total contributions made by that contributor for the calendar year. For contributions received in excess of $100, the registrant must obtain and report the name and address of the donor's place of employment. All other income in excess of $20 — including transfers of funds, interest, returns on investments, rebates, and refunds received — must be listed and described.
Registrants must report all disbursements. For every disbursement in excess of $20, the registrant must include the name and address of the recipient, the date *363 of the disbursement, and a statement of its purpose. Individuals and committees not primarily organized for political purposes need only report disbursements made for the purpose of expressly advocat[ing] the election or defeat of a clearly identified candidate. In other words, committees in this category need not report general operating expenses; for all other committees, administrative and overhead expenses must be reported as disbursements. All disbursements that count as contributions to candidates or other committees must be reported.
Borland II, 751 F.3d at 814 (internal citations and quotations omitted). "No person may prepare or submit a false report or statement to a filing officer under [Chapter 11]." Wis. Stat. § 11.27(1). A registrant that intentionally violates § 11.27(1) is subject to criminal penalty. See Wis. Stat. § 11.61(l)(b).
¶ 604. To understand Wis. Stat. § 11.06(l)'s full reach on constitutionally protected speech, the terms "contribution" and "disbursement" must be construed.[23] As previously noted, a "contribution" includes a "gift... of money ... or anything of value . . . made for political purposes." Wis. Stat. § 11.01(6)(a)l. The definition encompasses a "disbursement by a contributor to procure a thing of value or service for the benefit of a registrant who authorized the disbursement." Wis. Admin. Code § GAB 1.20(l)(e). A disbursement made for the benefit of a candidate that is prearranged with the candidate or the candidate's agent is treated as a *364 contribution to the candidate or the campaign committee that must be reported as a contribution received. Wis. Stat. § 11.06(4)(d).
¶ 605. A "disbursement" includes "A purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value . . . made for political purposes." Wis. Stat. § 11.01(7)(a)l.
¶ 606. A "contribution" and a "disbursement" must be made for "political purposes." "Political purposes" is defined to include an act done "for the purpose of influencing" an election. Wis. Stat. § 11.01(16).
¶ 607. To reiterate, the phrase "for the purpose of influencing" an election has caused overbreadth and vagueness problems in the context of campaign-finance regulation where it serves to restrict independent expenditures. See Buckley, 424 U.S. at 77-80; MCFL, 479 U.S. at 249; Barland, II, 751 F.3d at 833. That is because restraints on independent expenditures have the potential to encumber a substantial amount of protected speech. Buckley, 424 U.S. at 19. At first blush, then, Wis. Stat. § 11.06(l)'s reporting requirement for "disbursements" raises the specter of unconstitutionality as far as independent spending is concerned. But Wis. Stat. § 11.06(2) solves that dilemma, exempting from § 11.06(l)'s reporting requirement independent disbursements that do not "expressly advocate the election or defeat of a clearly identified candidate ...." Thus, with respect to § 11.06(l)'s regulation of independent disbursements, there are no overbreadth and vagueness concerns in the sense meant by Buckley.
¶ 608. That leaves the question of whether the phrase "for the purpose of influencing" an election, incorporated in Wis. Stat. § 11.06(1) through the definition of "contribution," raises constitutional concerns in the sense meant by Buckley. Clearly, the answer is "no."
*365 ¶ 609. For starters, restrictions on contributions pose marginal as opposed to substantial burdens on speech. Id. at 20 — 21; see also Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm., 533 U.S. 431, 440 (2001) (Colorado II) ("Restraints on expenditures generally curb more expressive and associational activity than limits on contributions do."). The main rationale is that restraints on contributions have little direct impact on political communication, as they permit the symbolic expression of support and leave the contributor free to discuss candidates and issues. Buckley, 424 U.S. at 21. Arguably, that justification might not apply with equal force to contributions that take the form of coordinated issue advocacy, since such contributions do "communicate the underlying basis for the [contributor's] support." Id. But there is a simple solution to that problem: stop coordinating. In the absence of coordination, the contributor is free to discuss candidates and issues.
¶ 610. That restrictions on contributions impose marginal burdens on free speech is especially true where the restriction at issue involves disclosure rather than a ceiling on the amount of money a person can give to a campaign. See Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 369 (2010) ("The Court has explained that disclosure is a less restrictive alternative to more comprehensive regulations of speech."). Even the majority is forced to acknowledge the fact that disclosure requirements pose less significant burdens on the exercise of free speech.[24] So it is important to keep in mind that Wis. Stat. § 11.06(1) requires disclosure of contributions made and received.
*366 ¶ 611. In light of the more modest burdens that Wis. Stat. § 11.06(1) imposes on the free speech rights of those that make and receive contributions, it is clear that less precision and clarity is required with respect to what is regulated. See Barland II, 751 F.3d at 837 ("The greater the burden on the regulated class, the more acute the need for clarity and precision."). That leads me to conclude that the phrase "for the purpose of influencing" an election is not problematic where it operates to regulate contributions under § 11.06(1). Indeed, Buckley supports my position. See Buckley, 424 U.S. at 23 n.24 ("The use of the phrase presents fewer problems in connection with the definition of a contribution because of the limiting connotation created by the general understanding of what constitutes a political contribution.").
¶ 612. It is common sense that a gift of money to a candidate or a campaign committee constitutes an act made for the purpose of influencing an election. It is also common sense that money spent on services for the benefit of a candidate or a campaign committee that authorized the spending is an act done for the purpose of influencing an election. Similarly, where a candidate or a candidate's agent and a third party prearrange the third party's spending for the benefit of the candidate, common sense says the spending is done for the purpose of influencing an election. The point is that the aforementioned actions are connected with a candidate or his or her campaign.
¶ 613. Therefore, I conclude that Wis. Stat. § 11.06(1) is neither overbroad nor vague in its requirement that candidate committees report receipt of in-kind contributions in the form of coordinated spending on issue advocacy.
*367 ¶ 614. The majority disagrees, although it does not address Wis. Stat. § 11.06(1) in reaching its conclusion that the special prosecutor fails to advance a valid argument under Wisconsin criminal law. Rather, the majority dismisses the special prosecutor's primary argument by analyzing the GAB's definition of the term "in-kind contribution."[25] That approach is inconsistent with First Amendment overbreadth and vagueness analysis. See Williams, 553 U.S. at 293 ("The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."); Madigan, 697 F.3d at 479 (" 'In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.'") (quoted source and citation omitted). Wisconsin Admin. Code § GAB 1.20(l)(e), standing alone, does not regulate protected speech — it is a definition.
¶ 615. Had the majority performed a context specific First Amendment overbreadth and vagueness analysis, it presumably would have concluded that Wis. Stat. § 11.06(1) is unconstitutionally overbroad and vague in the sense meant by Buckley because it contains the terms "contribution" and "disbursement," thereby triggering "political purposes" and the phrase "for the purpose of influencing" an election.[26] But a correct reading of Buckley and its progeny leads to a conclusion that there are no constitutional infirmities with respect to § 11.06(1).
*368 ¶ 616. The majority's contrary conclusion ignores the legislature's intent in enacting Chapter 11. When searching for a limiting construction to cure an overly broad or vague statute, "we examine the language of the statute as well as its legislative history to determine whether the legislature intended the statute to be applied in its newly-construed form." State v. Janssen, 219 Wis. 2d 362, 380, 580 N.W.2d 260 (1998). By rejecting the special prosecutor's in-kind contribution argument and holding that contributions received need not be reported under Wis. Stat. § 11.06(1) unless they involve express advocacy or its functional equivalent, the majority disregards the legislature's declaration of policy in creating Chapter 11: ensuring that the public is fully informed of the true source of financial support to candidates for public office. Wis. Stat. § 11.001.
f 617. The majority's errors will have a detrimental effect on the integrity of Wisconsin's electoral process, particularly in the context of campaign contributions. Under the majority's holding, an act is not a campaign contribution unless it involves express advocacy or its functional equivalent.[27] The majority claims that its limiting construction is necessary to place issue advocacy beyond Chapter ll's reach,[28] but at what cost? Surely gifts of money to a campaign trigger the same quid pro quo corruption concerns that justify the regulation of communications for express advocacy or its functional equivalent, and yet gifts of money would not constitute contributions under the majority's holding. Since Buckley, the United States Supreme Court has consistently upheld restraints on such campaign contributions. See O'Keefe, 769 F.3d at 941. *369 Thus, I question the propriety of the majority's decision to tear down those restraints.
¶ 618. In sum, I conclude that Chapter 11 supports the special prosecutor's in-kind contribution argument. The majority's contrary determination is the product of a fundamental misunderstanding and misapplication of Buckley and its progeny, including Bar-land II, as well as the First Amendment overbreadth and vagueness principles that those decisions embody.
D. The Question of Whether the First Amendment Prohibits Regulation of Coordinated Issue Advocacy Should Not Prevent the John Doe Investigation From Moving Forward.
¶ 619. Having concluded that the special prosecutor makes a valid argument under Wisconsin criminal law, the question remains whether the First Amendment to the United States Constitution prohibits regulation of coordinated issue advocacy.[29] This question should be addressed by the United States Supreme Court because it has sparked "lively debate among judges and academic analysts." Id. at 942.
¶ 620. In O'Keefe, the plaintiffs filed suit seeking an injunction that would halt this John Doe investigation permanently, regardless of whether the special prosecutor could demonstrate a violation of Wisconsin *370 law. Id. at 938. In addition, the complaint sought damages against five defendants, including the special prosecutor and the Milwaukee County District Attorney. Id. The United States District Court for the Eastern District of Wisconsin "held that the First Amendment to the Constitution (as applied to the states through the Fourteenth) forbids not only penalties for coordination between political committees and groups that engage in issue advocacy, but also any attempt by the state to learn just what kind of coordination has occurred." Id. As a result, the district court rejected the defendants' argument that they enjoyed qualified immunity. Id. at 939.
¶ 621. In reversing the district court's order that rejected the defendants' qualified immunity defense, the Seventh Circuit, in an opinion authored by Judge Easterbrook, reasoned:
No opinion issued by the Supreme Court, or by any court of appeals, establishes ("clearly" or otherwise) that the First Amendment forbids regulation of coordination between campaign committees and issue-advocacy groups — let alone that the First Amendment forbids even an inquiry into that topic. The district court broke new ground. Its views may be vindicated, but until that day public officials enjoy the benefit of qualified immunity from liability in damages.
Id. at 942.
¶ 622. It is important to note that the United States Supreme Court has endorsed FECA's treatment of coordinated expenditures as contributions. As previously mentioned, in Buckley, the Supreme Court upheld FECA's limitations on individual and group political contributions notwithstanding the fact that "contribution" was defined to include coordinated expenditures. Buckley, 424 U.S. at 23-59. It also upheld *371 FECA's disclosure requirements on contributions so defined. Id. at 78. In Colorado II, the Supreme Court upheld FECA's limitations on coordinated expenditures between political parties and candidates. Colorado II, 533 U.S. at 465. Also, in McConnell, it upheld BCRA's treatment of coordinated disbursements for electioneering communications as contributions, even though the term "electioneering communication" was defined to include issue advocacy. McConnell, 540 U.S. at 203.
¶ 623. The basic rationale underlying the Supreme Court's endorsement of such restrictions is that coordinated expenditures "are as useful to the candidate as cash .. . ." Colorado II, 533 U.S. at 446. Thus, they are "disguised contributions" that "might be given 'as a quid pro quo for improper commitments from the candidate' (in contrast to independent expenditures, which are poor sources of leverage for a spender because they might be duplicative or counterproductive from a candidate's point of view." Id. (citing Buckley, 424 U.S. at 47). Since the prevention of quid pro quo corruption or its appearance remains a permissible goal justifying regulations on political speech, McCutcheon v. Fed. Election Comm'n, 134 S. Ct. 1434, 1441 (2014), it is certainly likely that the regulation of coordinated issue advocacy will withstand First Amendment scrutiny.
¶ 624. Moreover, as noted previously, the Supreme Court recently determined that the First Amendment permits the regulation of judicial candidates' speech. Williams-Yulee, 135 S. Ct. at 1662. The Supreme Court reasoned that states have a compelling interest in preserving public confidence in their judges by preventing quid pro quo corruption or its appearance. Id. at 1667-68. Thus, an argument can be made *372 that Williams-Yulee bolsters the special prosecutor's contention that the First Amendment permits the regulation of coordinated issue advocacy, since that is an area where corruption or its appearance is a significant concern as well.
¶ 625. Because the special prosecutor makes a valid argument under Wisconsin criminal law, and because the United States Supreme Court has not concluded that the First Amendment prohibits the regulation of coordinated issue advocacy, the John Doe investigation should not be terminated. Not only do the majority's errors serve to end a valid John Doe investigation, they work to limit the reach of Wisconsin's campaign-finance law in a manner that will undermine the integrity of our electoral process. I disagree with these consequences and therefore respectfully dissent in Two Unnamed Petitioners.
II. SCHMITZ v. PETERSON AND THREE UNNAMED PETITIONERS
¶ 626. The questions presented in Schmitz v. Peterson and Three Unnamed Petitioners boil down to whether the John Doe judge violated a plain legal duty in either initiating these proceedings or quashing various subpoenas and search warrants related to the investigation. Both the special prosecutor in Schmitz v. Peterson and the Unnamed Movants in Three Unnamed Petitioners carry a heavy burden in this regard, as a supervisory writ is an "extraordinary and drastic remedy that is to be issued only upon some grievous exigency." State ex. rel. Kalal v. Circuit Ct. for Dane Cnty., 2004 WI 58, ¶ 17, 271 Wis. 2d 633, 681 N.W.2d 110. I agree with the majority that neither the special *373 prosecutor nor the Unnamed Movants have established the prerequisites for a writ to issue.[30]
¶ 627. However, I wish to clarify that the majority's decision in Schmitz v. Peterson should not be construed as holding that the evidence gathered in the John Doe proceedings fails to provide a reasonable belief that Wisconsin's campaign-finance law was violated. The majority's decision to deny the writ rests solely on the fact that Reserve Judge Gregory Peterson made a discretionary decision to quash the subpoenas and search warrants at issue. By the very nature of the supervisory writ standard, the majority's conclusion takes no position on the propriety of Reserve Judge Peterson's decision in this regard.
III. CONCLUSION
¶ 628. By erroneously concluding that campaign committees do not have a duty under Wisconsin's campaign-finance law to report receipt of in-kind contributions in the form of coordinated spending on issue advocacy, the majority rejects the special prosecutor's primary argument regarding criminal activity. Although the special prosecutor advances a secondary argument of criminal activity concerning coordinated express advocacy, the majority inexplicably ignores that argument. These mistakes lead the majority to terminate a valid John Doe investigation in an unprecedented fashion.
¶ 629. With respect to the special prosecutor's primary argument, which is the focus of my writing, the majority misapplies the related doctrines of over-breadth and vagueness. Unlike the majority, I conclude that Wis. Stat. § 11.06(1) is neither overbroad *374 nor vague in its requirement that campaign committees report receipt of in-kind contributions. The majority also makes the troubling pronouncement that an act is not a regulable disbursement or contribution under Ch. 11 unless it involves express advocacy or its functional equivalent. This is an erosion of Ch. 11 that will profoundly affect the integrity of our electoral process. I cannot agree with this result.
¶ 630. It is also imperative to note that the majority conveniently overlooks the special prosecutor's secondary argument of criminal activity in its effort to end this John Doe investigation. Specifically, the special prosecutor seeks to investigate whether particular express advocacy groups coordinated their spending with candidates or candidate committees in violation of their sworn statement of independence under Wis. Stat. § 11.06(7) . Despite the fact that the special prosecutor utilizes a significant portion of his brief to present evidence of such illegal coordination, the majority determines, without explanation, that the John Doe investigation is over.
¶ 631. Has the majority abused its power in reaching this conclusion? The majority's rush to terminate this investigation is reminiscent of the action taken by the United States District Court for the Eastern District of Wisconsin in O'Keefe v. Schmitz, 19 F. Supp. 3d at 875, an action that was both criticized and reversed by the United States Court of Appeals for the Seventh Circuit in O'Keefe, 769 F.3d at 942. Although the focus of my writing lies elsewhere, the majority's error in this regard cannot be overlooked.
¶ 632. For these reasons, I respectfully dissent in State ex. rel. Two Unnamed Petitioners v. Peterson (Two Unnamed Petitioners).
*375 ¶ 633. However, because I agree that the special prosecutor and certain Unnamed Movants have failed to meet their heavy burden of establishing that the John Doe judge violated a plain legal duty in either initiating these proceedings or quashing various subpoenas and search warrants related to the investigation, I respectfully concur with the majority in State ex. rel. Schmitz v. Peterson (Schmitz v. Peterson) and State ex. rel. Three Unnamed Petitioners v. Peterson (Three Unnamed Petitioners). In concurring in Schmitz v. Peterson, it is significant for me that when an appellate court decides to issue a supervisory writ, it is a rare, discretionary decision. Madison Metro. Sch. Dist., 336 Wis. 2d 95, ¶¶ 33-34. Here, the John Doe judge also made a discretionary decision in deciding a complex legal issue. Deference should be given where there is such discretion.
¶ 634. For the foregoing reasons, I concur in part and dissent in part. To be clear, I agree with the majority's decision to deny the petition for supervisory writ and affirm Reserve Judge Gregory Peterson's order in Schmitz v. Peterson. I also agree with the majority's decision to deny the petition for supervisory writ and affirm the court of appeals' decision in Three Unnamed Petitioners. However, contrary to the majority, I would deny the relief sought in Two Unnamed Petitioners and allow the John Doe investigation to continue.

 All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

 See majority op., ¶¶ 17 — 27.

 The order consolidating the cases for purposes of briefing and oral argument is dated December 16,2014, and is attached hereto, along with my concurrence and that of Justice Prosser, as Exhibit A.

 Oral argument was canceled in the three cases pursuant to an order entered by this court on March 27, 2015. That order, along with my dissent and that of Justice Prosser, is attached hereto as Exhibit B.

 Wis. Stat. § 11.001(1).

 See majority op., ¶¶ 10, 41, 50, 57, 66-67, 69.
Issue advocacy is speech that pertains to issues of public concern and does not expressly advocate the election or defeat of a candidate. Fed. Election Comm'n v. Wis. Right to Life, Inc., 551 U.S. 449, 456 (2007). In contrast, express advocacy is speech that expressly advocates the election or defeat of a candidate. Id. at 453.

 "Anything Goes" is a song written by Cole Porter for his musical Anything Goes (1934). Many of the lyrics feature humorous (but dated) references to various figures of scandal and gossip in Depression-era high society. Many modern versions of the song omit the outdated lyrics, replacing them with present-day examples of social and political scandal.

 For the importance of the spirit of the law, see Jackson County v. DNR, 2006 WI 96, ¶ 32, 293 Wis. 2d 497, 717 N.W.2d 713; State v. Dagnall, 2000 WI 82, ¶ 59, 236 Wis. 2d 339, 612 N.W.2d 680; Harrington v. Smith, 28 Wis. 43, 59 (1871).

 Wis. Stat. § 11.001(1) (emphasis added).

 See majority op., ¶¶ 50, 57, 66-67.

 See majority op., ¶¶ 11, 76.
The majority opinion fails to acknowledge that the Special Prosecutor is pursuing multiple theories of criminal activity, not all of which revolve around issue advocacy. For example, the Special Prosecutor states that the John Doe investigation is premised in part "on a reason to believe that certain express advocacy groups who had filed sworn statements indicating they acted independently of certain campaign committees" did not in fact act independently. Despite the majority opinion's invalidating the Special Prosecutor's issue-advocacy-based theory of criminal activity, this express-advocacy-based theory lives on.
The majority opinion also fails to acknowledge that the original action was brought by only two Unnamed Movants. It seems the Special Prosecutor's investigation of individuals and organizations that are not parties to the original action is not affected by this court's decision in the original action. See Madison Teachers, Inc. v. Walker, 2013 WI 91, ¶ 20, 351 Wis. 2d 237,
*184 839 N.W.2d 388 (holding that a declaratory judgment was binding only insofar as the parties to the lawsuit were concerned; a declaratory judgment is not the equivalent of an injunction binding on the defendant state officers). Indeed, the majority opinion and concurring opinions imply that the original action does not bind the other Unnamed Movants by deciding the second and third John Doe cases within the John Doe trilogy. If the majority opinion's decision in the original action disposes of the John Doe investigation in its entirety, why address the other John Doe cases?

 See O'Keefe v. Chisholm, 769 F.3d 936, 942 (7th Cir. 2014). For discussions of the constitutionality of regulating coordinated issue advocacy, see Brent Ferguson, Beyond Coordination: Defining Indirect Campaign Contributions for the Super PAC Era, 42 Hastings Const. L.Q. 471 (2015); Richard Briffault, Coordination Reconsidered, 113 Columbia L. Rev. Sidebar 88 (2013); Bradley A. Smith, Super PACs and the Role of "Coordination" in Campaign Finance Law, 49 Willamette L. Rev. 603 (2013).

 See items 1-14 in this court's order dated December 16, 2014 (attached hereto as Exhibit A), setting forth the questions this court accepted for review.

 See this court's December 16, 2014, order, attached hereto as Exhibit A (emphasis added).

 I refer to the eight challengers to the John Doe proceedings as Unnamed Movants because that has been the parties' practice in briefing. In the case captions for two of the three John Doe cases, the Unnamed Movants are referred to as Unnamed Petitioners.

 Wis. Stat. § 11.06(4)(d). See also Wis. Stat. § 11.06(7) (describing independent disbursements as disbursements made by a committee or individual who "does not act in cooperation or consultation with any candidate or authorized committee of a candidate" and who "does not act in concert with, or at the request or suggestion of, any candidate or agent or authorized committee of a candidate").

 See majority op., ¶¶ 50, 57, 66-67.

 O'Keefe, 769 F.3d at 937.

 See majority op., f ¶ 34-36, 97.

 See majority op., ¶ 97.

 See majority op., ¶ 13.

 See majority op., ¶¶ 105-106.

 See this court's December 16, 2014, order and my concurrence thereto (attached as Exhibit A) and this court's March 27, 2015, order regarding redactions and my dissent thereto (attached as Exhibit C).

 See State v. Subdiaz-Osorio, 2014 WI 87, ¶¶ 9-10, 357 Wis. 2d 41, 849 N.W.2d 748; State v. Tate, 2014 WI 89, 357 Wis. 2d 172, 849 N.W.2d 798.

 See Wis. Stat. § 11.06(4)(d). See also § 11.06(7) (describing independent disbursements as disbursements made by a committee or individual who "does not act in cooperation or consultation with any candidate or authorized committee of a candidate" and who "does not act in concert with, or at the request or suggestion of, any candidate or agent or authorized committee of a candidate").

 Wis. Right to Life, 551 U.S. at 456.

 The only facts set forth in the petition and briefs filed by Unnamed Movants 6 and 7 are procedural in nature, regarding the appointment of the John Doe Judge and the Special Prosecutor and the issuance and execution of subpoenas and search warrants.
Justice Ziegler's concurrence in the John Doe trilogy is based solely on unsubstantiated allegations made in the parties' briefs regarding the execution of the search warrants issued by the John Doe judge. Although there have been no findings or *195 stipulations of fact regarding the execution of the search warrants, Justice Ziegler nevertheless writes at length to suggest that the execution of the search warrants rendered them unconstitutional under the Fourth Amendment. She states: "[E]ven if the search warrants were lawfully issued, the execution of them could be subject to the reasonableness analysis of the Fourth Amendment...." Justice Ziegler's concurrence, ¶¶ 309, 340. This issue has not been litigated and is not, in my view, properly before this court.

 See Wis. S. Ct. IOP II.B.3. (May 4, 2012), which provides in relevant part as follows:
The Supreme Court is not a fact-finding tribunal, and although it may refer issues of fact to a circuit court or referee for determination, it generally will not exercise its original jurisdiction in matters involving contested issues of fact. Upon granting a *196 petition to commence an original action, the court may require the parties to file pleadings and stipulations of fact.

 The Special Prosecutor has a second and related theory-based on Wis. Stat. § 11.10(4). Section 11.10(4) provides that a putatively separate committee that "acts with the cooperation of or upon consultation with a candidate or agent or authorized committee of a candidate, or which acts in concert with or at the request or suggestion of a candidate or agent or authorized committee of a candidate is deemed a subcommittee of the candidate's personal campaign committee."
The Special Prosecutor asserts that coordination between various 501(c) entities and the candidate's campaign committee may have rendered one or more of the 501(c) entities statutory subcommittees, whose receipt of contributions and disbursement of funds are reportable by the candidate's campaign committee. Under this theory, the candidate's campaign committee violated Chapter 11 by failing to report issue advocacy disbursements made by a subcommittee of the candidate's campaign committee. The subcommittee theory is not as fully developed in the Special Prosecutor's brief as the theory set forth above. Because I conclude that the Special Prosecutor's primary theory is sufficient to support the continuation of the John Doe proceedings, it is unnecessary to decide whether the subcommittee theory does so as well. Accordingly, I do not address the subcommittee theory.
I note, as well, that the John Doe judge determined that the Special Prosecutor offered no evidence of express advocacy. The Special Prosecutor disagrees. I do not address this factual dispute.

 O'Keefe, 769 F.3d at 941.

 See Wis. Stat. §§ 11.27 and 11.61(l)(b).

 Wis. Right to Life v. Borland, (Borland II), 751 F.3d 804, 808 (7th Cir. 2014) (emphasis added).

 See, e.g., id.

 Section 11.01(6)(a) reads in relevant part as follows:
(6)(a) Except as provided in par. (b), "contribution" means any of the following:
1. A gift, subscription, loan, advance, or deposit of money or anything of value, except a loan of money by a commercial lending institution made by the institution in accordance with applicable laws and regulations in the ordinary course of business, made for political purposes. In this subdivision "anything of value" means a thing of merchantable value.

 Section 11.01(7)(a) reads in relevant part as follows:
(7)(a) Except as provided in par. (b), "disbursement" means any of the following:
1. A purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, except a loan of money by a commercial lending institution made by the institution in accordance with applicable laws and regulations in the ordinary course of business, made for political purposes. In this subdivision, "anything of value" means a thing of merchantable value.

 Section 11.01(16) reads in full as follows:
(16) An act is for "political purposes" when it is done for the purpose of influencing the election or nomination for election of any individual to state or local office, for the purpose of influencing the recall from or retention in office of an individual holding a state or local office, for the purpose of payment of expenses incurred as a result of a recount at an election, or for the purpose of influencing a particular vote at a referendum. In the case of a candidate, or a committee or group which is organized primarily for the purpose of influencing the election or nomination for election of any individual to state or local office, for the purpose of influencing the recall from or retention in office of an individual holding a state or local office, or for the purpose of influencing a particular vote at a referendum, all administrative and overhead expenses for the maintenance of an office or staff which are used principally for any such purpose are deemed to he for a political purpose.
(a) Acts which are for "political purposes" include but are not limited to:
1. The making of a communication which expressly advocates the election, defeat, recall or retention of a clearly identified candidate or a particular vote at a referendum.
2. The conduct of or attempting to influence an endorsement or nomination to be made at a convention of political party members or supporters concerning, in whole or in part, any campaign for state or local office.
*202 (b) A "political purpose" does not include expenditures made for the purpose of supporting or defending a person who is being investigated for, charged with or convicted of a criminal violation of state or federal law, or an agent or dependent of such a person.

 Wis. Stat. § 11.01(16)(a).

 Wis. Stat. § 11.01(16).

 As the United States Supreme Court has explained, "[Candidates, especially incumbents, are intimately tied to *203 public issues involving legislative proposals and governmental actions." Buckley v. Valeo, 424 U.S. 1, 42 (1976). See also Wis. Right to Life, 551 U.S. at 456-57 (explaining that the distinction between express advocacy and issue advocacy may dissolve in practice because, as Buckley put it, "Candidates . . . are intimately tied to public issues" (quoting Buckley, 424 U.S. at 42)).

Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm. (Colorado II), 533 U.S. 431, 446 (2001) (explaining why independent disbursements made for issue advocacy are "poor sources of leverage for a spender").

 Id. at 446 (explaining why coordinated expenditures are treated as contributions under federal law).
This is a point the United States Supreme Court has made again and again. For example, in Buckley, 424 U.S. at 46, the Court stated that "expenditures controlled by or coordinated with the candidate and his campaign might well have virtually the same value to the candidate as a contribution .. . ." Similarly, in McConnell v. Fed. Election Comm'n, 540 U.S. 93, 221—22 (2003), overruled on other grounds by Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010), the Court explained that "expenditures made after a 'wink or nod' often will be 'as useful to the candidate as cash.'"

 See, e.g., McConnell, 540 U.S. at 214-15 (explaining that federal law "treats expenditures that are coordinated with a candidate as contributions to that candidate"); Colo. Republican Fed. Campaign Comm. v. Fed. Election Comm'n, 518 U.S. 604, 611 (1996) (stating that contribution limits in federal campaign finance law apply not only to direct contributions but also to "coordinated expenditures," that is, indirect contributions); Buckley, 424 U.S. at 46 (providing that under federal law, "controlled or coordinated expenditures are treated as contributions rather than expenditures").
United States Supreme Court case law governing the constitutionality of campaign finance statutes discusses "expenditures," not "disbursements," because the word "expenditure" is used in federal law. The word "disbursement" is used in the Wisconsin statutes.

 Section 11.06(4) provides in full as follows:
(4) When transactions reportable, (a) A contribution, is received by a candidate for purposes of this chapter when it is under the control of the candidate or campaign treasurer, or such person accepts the benefit thereof. A contribution is received by an individual, group or committee, other than a personal campaign committee, when it is under the control of the individual or the committee or group treasurer, or such person accepts the benefit thereof.
(b) Unless it is returned or donated within 15 days of receipt, a contribution must be reported as received and accepted on the date received. This subsection applies notwithstanding the fact that the contribution is not deposited in the campaign depository account *205 by the closing date for the reporting period as provided in s. 11.20(8).
(c) All contributions received by any person acting as an agent of a candidate or treasurer shall be reported by such person to the candidate or treasurer within 15 days of receipt. In the case of a contribution of money, the agent shall transmit the contribution to the candidate or treasurer within 15 days of receipt.
(d) A contribution, disbursement or obligation made or incurred to or for the benefit of a candidate is reportable by the candidate or the candidate's personal campaign committee if it is made or incurred with the authorization, direction or control of or otherwise by prearrangement with the candidate or the candidate's agent.
(e) Notwithstanding pars, (a) to (e), receipt of contributions by registrants under s. 11.05(7) shall be treated as received in accordance with that subsection.

 Buckley, 424 U.S. at 46.

 Wis. Stat. § 11.06(4)(d). See also Wis. Coalition for Voter Participation, Inc. v. State Elections Bd. (WCVP), 231 Wis. 2d 670, 681, 605 N.W.2d 654 (Ct. App. 1999) (explaining that both federal campaign finance regulations and Chapter 11 "treat expenditures that are 'coordinated' with, or made 'in cooperation with or with the consent of a candidate ... or an authorized committee' as campaign contributions" (emphasis added)). The majority opinion apparently overrules WCVP to the extent that WCVP implies that the definition of the phrase "for political purposes" in Chapter 11 extends beyond express advocacy and its functional equivalent. See majority op., f 68 n.23.

 See, e.g., Wis. Stat. § 11.06(2) (providing that independent disbursements are reportable only if they are for express advocacy purposes).

 See Wis. Stat. § 11.27(1) (providing that "[n]o person may prepare or submit a false report or statement to a filing officer under this chapter"); Wis. Stat. § 11.61(l)(b) (stating that "[w]hoever intentionally violates ... 11.27(1) ... is guilty of a Class I felony if the intentional violation does not involve a specific figure or if the intentional violation concerns a figure which exceeds $100 in amount or value").

 Center for Individual Freedom v. Madigan, 697 F.3d 464, 479 (7th Cir. 2012) ("In the First Amendment context, vagueness and overbreadth are two sides of the same coin .. . .").

 Majority op., ¶ 11.

 In his November 6, 2014, order denying the two Unnamed Movants' motion to have the Special Prosecutor show cause why the John Doe investigation should not be ended, the John Doe judge stated:
[Tjhere is a strong public interest in having the appellate courts answer the statutory question that is at the heart of this litigation: when Wisconsin's campaign finance laws prohibit coordination between candidates and independent organizations for a political purpose, does that political purpose require express advocacy? This is an important question that has spawned considerable litigation. The citizens of this state need and deserve a definitive answer. They will not get one if I grant the motion.
This order was not publicly released. Other portions of the order refer to matters subject to the John Doe secrecy order. The above-quoted portion does not.

 See the John Doe judge's November 6, 2014, order.

 O'Keefe, 769 F.3d at 942.

 Id. at 941.

 The relevant portion of the O 'Keefe opinion provided in full as follows:
Plaintiffs' claim to constitutional protection for raising funds to engage in issue advocacy coordinated with a politician's campaign committee [the same claim asserted by Unnamed Movants 6 and 7 in this original action] has not been established "beyond debate." To the contrary, there is a lively debate among judges and academic analysts. The Supreme Court regularly decides campaign-finance issues by closely divided votes. No opinion issued by the Supreme Court, or by any court of appeals, establishes ("clearly" or otherwise) that the First Amendment forbids regulation of coordination between campaign committees and issue-advocacy groups' — let alone that the First Amendment forbids even an inquiry into that topic.
O'Keefe, 769 F.3d at 942.
For discussion of whether coordinated issue advocacy is constitutionally protected, see, e.g., Ferguson, supra note 12; Briffault, supra note 12; Smith, supra note 12.

 See generally Buckley, 424 U.S. at 14—23. See also Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 345 (2010) ("The Buckley Court explained that the potential for quid pro quo corruption distinguished direct contributions to candidates from independent expenditures.").

 Buckley, 424 U.S. at 23-59.

 Id.

 Id. at 21.

 Id. at 25-26.

 Id. at 39.

 Id. at 47.

 As a matter of statutory interpretation (to avoid invalidation on vagueness grounds), the Buckley Court determined that the independent expenditure disclosure requirement applied only to independent expenditures made for express advocacy purposes, not to independent expenditures made for issue advocacy purposes. Buckley, 424 U.S. at 78-80. The Court did not so limit the contribution disclosure requirement. Id. at 78.

 Buckley, 424 U.S. at 66.

 Id at 68.

 Id at 78.

 Id. at 46-47. See also Ferguson, supra note 12, at 479 (explaining that the United States Supreme Court "continues to clearly signal that the line between contributions and expenditures depends on a spender's independence").

 Buckley, 424 U.S. at 46-47.

 Colorado II, 533 U.S. at 464-65.

 Id. at 446 (citations omitted).
Later on, the Colorado II Court further stated that
[t]here is no significant functional difference between a party's coordinated expenditure and a direct party contribution to the candidate, and there is good reason to expect that a party's right of unlimited coordinated spending would attract increased contributions to parties to finance exactly that kind of spending. Coordinated expenditures of money donated to a party are tailor-made to undermine contribution limits. Therefore the choice here is not, as in Buckley and Colorado I, between a limit on pure contributions and pure expenditures. The choice is *216 between limiting contributions and limiting expenditures whose special value as expenditures is also the source of their power to corrupt.
Colorado II, 533 U.S. at 464-65.

 Federal Election Commission v. Christian Coalition, 52 F. Supp. 2d 45 (D.D.C. 1999).has had a far-reaching impact on state and federal regulation of campaign coordination. See Ferguson, supra note 12, at 481.

 Christian Coalition, 52 F. Supp. 2d at 88.

 Christian Coalition, 52 F. Supp. 2d at 88. See also McConnell, 540 U.S. at 190 ("[T]he express advocacy restriction [imposed by Buckley] was an endpoint of statutory interpretation, not a first principle of constitutional law.").

 Christian Coalition, 52 F. Supp. 2d at 88.

 McConnell, 540 U.S. at 221.

 Christian Coalition, 52 F. Supp. 2d at 88.

 The few Wisconsin authorities available on the subject of coordinated disbursements track the reasoning of Christian Coalition. See, e.g., Wis. Coalition for Voter Participation, Inc. v. State Elections Bd. (WCVP), 231 Wis. 2d 670, 605 N.W.2d 654 (Ct. App. 1999) (addressing Chapter ll's regulation of coordinated issue advocacy disbursements in Justice Jon Wilcox's election campaign). In WCVP, the Wisconsin court of appeals explained that although Buckley imposed limits on the regulation of independent disbursements for issue ads, "neither Buckley nor [Chapter 11J limit the state's authority to *218 regulate or restrict campaign contributions." Id. at 679. The WCVP court further explained that Chapter 11 "treat!s] expenditures that are 'coordinated' with, or made 'in cooperation with or with the consent of a candidate ... or an authorized committee' as campaign contributions." Id. at 681. Under WCVP, the mere fact that Chapter 11 regulates coordinated disbursements for issue ads does not conflict with the constitutional principles set forth in Buckley.
See also Wis. El. Bd. Op. 00-2 (reaffirmed Mar. 26, 2008) adopting the Christian Coalition approach to examining the conduct of the candidate and the entity disbursing funds and explaining that "the Courts seemed to be willing to merge express advocacy with issue advocacy if 'coordination' between the spender and the campaign is sufficient."

 See, e.g., McConnell, 540 U.S. at 221 (2003) ("[T]he rationale for affording special protection to wholly independent expenditures has nothing to do with the absence of agreement and everything to do with the functional consequences of different types of expenditures.").

 In Citizens United, 558 U.S. at 368-69, the Court rejected the contention that "the disclosure requirements in § 201 [of the Bipartisan Campaign Reform Act of2002] must be confined to speech that is the functional equivalent of express advocacy." Id. at 368. The distinction between issue advocacy and express advocacy drawn by the Court in prior cases considering restrictions on independent expenditures should not, the Citizens United Court held, be imported into the realm *219 of disclosure requirements. By making clear that the express/issue advocacy distinction is relevant only with regard to independent expenditures, Citizens United corroborates Christian Coalition's holding that the distinction is irrelevant to the limits and disclosure requirements applicable to coordinated expenditures.
Madigan, 697 F.3d at 484, relies on this discussion in Citizens United to support its conclusion that the express/issue advocacy distinction is constitutionally irrelevant in the context of disclosure requirements:
[MJandatory disclosure requirements are constitutionally permissible even if ads contain no direct candidate advocacy .... Whatever the status of the express advocacy/issue discussion distinction may be in other areas of campaign finance law, Citizens United left no doubt that disclosure requirements need not hew to it to survive First Amendment scrutiny. With just one exception, every circuit that has reviewed First Amendment challenges to disclosure requirements since Citizens United has concluded that such laws may constitutionally cover more than just express advocacy and its functional equivalents, and in each case the court upheld the law.
(Citation omitted.)
Madigan cites and relies on other federal cases that reach the same conclusion in light of Citizens United, including The Real Truth About Abortion, Inc. v. Fed. Election Comm'n, 681 F.3d 544, 551 (4th Cir. 2012) (explaining that Citizens United upheld disclosure requirements for communications "that are not the functional equivalent of express advocacy"); Nat'l Org. for Mar riage v. McKee, 649 F.3d 34, 54-55 (1st Cir. 2011) ("We find it reasonably clear, in light of Citizens United, that the distinction between issue discussion and express advocacy has no place in First Amendment review of these sorts of disclosure-oriented laws."); and Human Life of Wash., Inc. v. Brumsickle, 624 F.3d 990, 1016 (9th Cir. 2010) ("Given the Court's analysis in Citizens United, and its holding that the government may impose disclosure requirements on speech, the position that disclosure requirements cannot constitutionally reach issue advocacy is unsupportable.").
*220 Since Madigan was decided, additional federal cases have interpreted Citizens United in the same manner, that is, as declaring that campaign finance disclosure requirements can cover more than express advocacy and its functional equivalent without running afoul of the First Amendment. See Vt. Right to Life Comm. v. Sorrell, 758 F.3d 118, 132 (2d Cir. 2014) ("In Citizens United, the [United States] Supreme Court expressly rejected the 'contention that the disclosure requirements must be limited to speech that is the functional equivalent of express advocacy,' because disclosure is a less restrictive strategy for deterring corruption and informing the electorate."); Iowa Right to Life Comm. v. Tooker, 717 F.3d 576, 591 n.1 (8th Cir. 2013) ("Disclosure requirements need not 'be limited to speech that is the functional equivalent of express advocacy.' " (quoting Citizens United)’, Independence Inst. v. Fed. Election Comm'n, 70 F.Supp.3d 502 (D.D.C. Oct. 6, 2014) (stating that the Citizens United Court "in no uncertain terms ... rejected the attempt to limit [federal campaign finance law] disclosure requirements to express advocacy and its functional equivalent").

 Barland II, 751 F.3d at 829 (emphasis added).

 Id at 809.

 See Wis. Stat. § 11.01(6)(a).

 See Wis. Stat. § 11.01(7)(a).

 Buckley, 424 U.S. at 39 (emphasis added).

 170. Id. at 42.

 Id. at 77.

 Id. at 79.

 Id. at 80.

 Id. at 46-47. See also Colorado II, 533 U.S. at 463-64 (explaining that the imposition of a limiting construction on provisions imposing expenditure limits in Buckley and subsequent federal cases "ultimately turned on the understanding that the expenditures at issue were not potential alter egos for contributions, but were independent.... [T]he constitutionally significant fact. . . was the lack of coordination between the candidate and the source of the expenditure" (internal quotation marks and citation omitted) (emphasis added)).

 See Buckley, 424 U.S. at 29-30, 78.

 See O'Keefe, 769 F.3d at 942.

 McConnell, 540 U.S. at 190.

 Id. at 191 — 92 (footnote omitted).
See also Wis. Right to Life, 551 U.S. at 474 n.7 (Roberts, C.J., controlling opinion) ("Buckley's intermediate step of statutory construction on the way to its constitutional holding does not dictate a constitutional test.").

 Barland II, 751 F.3d at 834.

 Barland II, 751 F.3d at 834 ("As applied to political speakers other than candidates, their committees, and political parties, the statutory definition of 'political purposes'. . . [is] limited to express advocacy and its functional equivalent . . . .") (emphasis added).

 See Barland II, 751 F.3d at 837 ("The First Amendment vagueness and overbreadth calculus must be calibrated to the kind and degree of the burdens imposed on those who must comply with the regulatory scheme."). See also United States v. Williams, 553 U.S. 285, 293 (2008) ("[I]t is impossible to determine whether a statute reaches too far without first knowing what the statute covers.").

 Buckley, 424 U.S. at 23 n.24 (citations omitted). See also id. at 78-80, which addresses the vagueness challenge brought against disclosure and reporting requirements applicable to contributions and expenditures. The Court denied the challenge insofar as it reached contributions. With regard to *228 expenditures, the Court denied the challenge insofar as it reached non-independent political speakers:
The general requirement that "political committees" and candidates disclose their expenditures could raise similar vagueness problems, for "political committee" is defined only in terms of amount of annual "contributions" and "expenditures," and could be interpreted to reach groups engaged purely in issue discussion. The lower courts have construed the words "political committee" more narrowly. To fulfill the purposes of the Act they need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate. Expenditures of candidates and of "political committees" so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related.
Buckley, 424 U.S. at 79 (footnotes omitted).

 For a discussion of state and federal campaign finance statutes that regulate or define campaign coordination, see Ferguson, supra note 12. This article argues not only that campaign coordination can be regulated consistent with the First Amendment but also that the coordination subject to regulation should include third-party expenditures that a candidate deems valuable, as evidenced by the candidate's conduct.

 McConnell, 540 U.S. at 222 (2003).

 Id. (quoted source omitted).

 Id.

 Id. at 223 (citation omitted).

 Id. at 222 (internal quotation marks omitted).

 Madigan, 697 F.3d at 470.

 Id. at 494 (emphasis added).

 Id. at 495.

 Id. at 496.

 Id

 Id at 497.

 See, e.g., State v. Henley, 2010 WI 12, 322 Wis. 2d 1, 778 N.W.2d 853 (memorandum opinion by Justice Roggensack explaining her decision not to disqualify herself).
See also State v. Allen, 2010 WI 10, 322 Wis. 2d 372, 778 N.W.2d 863. In Allen, the defendant filed a motion before Justice Gableman individually seeking his recusal. Justice Gableman denied the motion without explanation on September 10, 2009. Id., ¶ 15. The defendant then filed a supplemen *233 tal motion addressed to the whole court, seeking review of whether Justice Gableman had properly considered whether he could act impartially or whether it appeared he could not act impartially. Id., ¶ 16. On January 15, 2010, Justice Gable-man then filed a supplement to his September 10, 2009, order, explaining why he had denied the recusal motion. Id., ¶ 17. On February 4,2010, he withdrew from participation in the court's consideration of the recusal motion. Id., ¶ 18. The remaining members of the court were evenly divided regarding whether to deny the defendant's recusal motion or order briefs and oral argument on the matter. Accordingly, the motion was not granted.

 Early on in the instant litigation (long before any recusal motion was filed), Justice Ann Walsh Bradley advised all parties that she was not participating. Her statement of non-participation is attached hereto as Exhibit D.

 Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 877 (2009) (citations omitted).

 Id. (citations omitted).

 Id. at 885-87.

 The Special Prosecutor claims that much of the information the John Doe secrecy orders and this court's redaction orders intended to conceal has been divulged through media leaks. The Special Prosecutor pointedly wonders what the court is going to do, if anything, about these alleged leaks.
I anticipate that a motion to open this court's records and briefs regarding the John Doe trilogy will be filed when the three cases are completed. The sealed and redacted material will not be released, however, without a motion, opportunity to be heard, and court order.

 For a full discussion of my reasons for objecting to the extensive sealing and redactions ordered by the court in these cases, please see my dissents in each of the following three orders issued by this court on March 27, 2015: (1) an order denying the Milwaukee Journal Sentinel's motion to intervene in the John Doe cases for the sole purpose of advocating for increased public access (attached hereto as Exhibit E); (2) an order canceling oral argument (attached hereto as Exhibit B); and (3) an order relating to redaction (attached hereto as Exhibit C).
See also my dissents to orders issued by this court on April 1, 2015, and April 17, 2015, as well as a letter dated May 12, 2015 issued by Diane Fremgen, Clerk of Supreme Court.

 See, for example, the quote set forth in ¶ 256 of Justice Prosser's concurrence, pulled from an Unnamed Movant's brief. This quote is redacted in its entirety in the Unnamed Movant's redacted brief.

 Majority op., ¶ 14 n.ll.

 Justice Prosser's concurrence, ¶ 145.

 See majority op., ¶¶ 34-36, 75, 97.

 See majority op., ¶ 12.

 See majority op., ¶ 97.

 See majority op., ¶ 81 (quoting State ex rel. Kalal v. Circuit Court, 2004 WI 58, ¶ 24, 271 Wis. 2d 633, 681 N.W.2d 110 (emphasis added)).

 My dissent in the instant case should be read in conjunction with my dissent in the original action. See ¶¶ 389-507, infra.

 State ex rel. Kalal v. Circuit Court, 2004 WI 58, ¶ 23, 271 Wis. 2d 633, 681 N.W.2d 110.

 Id., ¶ 24.

 Id. (emphasis added, citations omitted).

 In re Petition of Pierce-Arrow Motor Car Co., 143 Wis. 282, 285, 127 N.W. 998 (1910).
At the time the Pierce-Arrow case was decided, Article VII, Section 3 of the Wisconsin Constitution stated in relevant part as follows: "The supreme court shall have a general superintending control over all inferior courts; it shall have the power to issue writs of. . . mandamus, injunction. . . and other original and remedial writs, and to hear and determine the same."
Since 1978, Article VII, Section 3(1) of the Wisconsin Constitution has provided that "[t]he supreme court shall have superintending and administrative authority over all courts." Section 3(2) states that "[t]he supreme court may issue all writs necessary in aid of its jurisdiction."

 Pierce-Arrow, 143 Wis. at 287.

 Pierce-Arrow, 143 Wis. at 286 (emphasis added).

 See John D. Wickhem, The Power of Superintending Control of the Wisconsin Supreme Court, 1941 Wis. L. Rev. 153, 163 (1941). This article is generally viewed as the best explanation of the Wisconsin constitutional provision regarding superintending authority and writs.

 John D. Wickhem, The Power of Superintending Control of the Wisconsin Supreme Court, 1941 Wis. L. Rev. 153, 161 (1941).

 See State ex rel. Hustisford Light, Power & Mfg. Co. v. Grimm, 208 Wis. 366, 371, 243 N.W. 763 (1932).

 John D. Wickhem, The Power of Superintending Control of the Wisconsin Supreme Court, 1941 Wis. L. Rev. 153, 161, 164 (1941).

 See, e.g., State ex rel. Ampco Metal, Inc. v. O'Neill, 273 Wis. 530, 535, 78 N.W.2d 921 (1956); Madison Metro. Sch. Dist. v. Circuit Court, 2011 WI 72, 336 Wis. 2d 95, 800 N.W.2d 442.

 Article VII, Section 5(3) of the Wisconsin Constitution *245 provides: "The appeals court may issue all writs necessary in aid of its jurisdiction and shall have supervisory authority over all actions and proceedings in the courts in the district."

 Madison Metro. Sch. Dist., 336 Wis. 2d 95, ¶ 84.

 id, ¶ 84.

 id

 Id., ¶ 85.

 See, for example, the following cases explaining that the issuance of a supervisory writ involves the exercise of discretion: Madison Metro. Sch. Dist., 336 Wis. 2d 95, ¶ 34; Kalal, 271 Wis. 2d at 649; State ex rel. Kurkierewicz v. Cannon, 42 Wis. 2d 368, 375, 166 N.W.2d 255 (1969); State ex rel. Dressler v. Circuit Court, 163 Wis. 2d 622, 630, 472 N.W.2d 532 (Ct. App. 1991).

 City of Madison v. DWD, 2003 WI 76, ¶ 10, 262 Wis. 2d 652, 664 N.W.2d 584. See also majority op., ¶ 105.

 Dressler, 163 Wis. 2d at 630; State ex rel. Storer Broad. Co. v. Gorenstein, 131 Wis. 2d 342, 347, 388 N.W.2d 633 (Ct. App. 1986).

 what I refer to as "the third case" comprises five cases. One of the defendants in each case is the chief judge of the county in which the case is pending.

 Majority op., ¶ 105.

 Majority op., ¶ 13.

 See majority op., ¶¶ 95-99 (discussing the plain legal duty issue presented in the second case within the John Doe trilogy), ¶ 107-132 (discussing the plain legal duty issues presented in the third case within the John Doe trilogy).

 The court of appeals has discretion whether to issue a supervisory writ. If the court of appeals misinterpreted or misapplied applicable law, it erroneously exercised its discretion. City of Madison v. DWD, 2003 WI 76, ¶ 10, 262 Wis. 2d 652, 664 N.W.2d 584. See also majority op., ¶ 102-106 (setting forth the standard of review applicable to the instant supervisory writ case).

 City of Madison v. DWD, 2003 WI 76, ¶ 10, 262 Wis. 2d 652, 664 N.W.2d 584.

 See State ex rel. Individual Subpoenaed v. Davis, 2005 WI 70, ¶¶ 23, 26, 281 Wis. 2d 431, 697 N.W.2d 803 ("A John Doe judge's authority stems both from the statutes and from powers inherent to a judge. . .. A John Doe judge's powers are not, however, limited to those enumerated in Wis. Stat. § 968.26 [the John Doe statute]. . . . A John Doe judge's inherent authority stems from a John Doe judge's judicial office.. . . [A] John Doe judge's inherent power encompasses all powers necessary for the John Doe judge to 'carry out his or her responsibilities with respect to the proper conduct of John Doe proceedings.'" (quoted source omitted)); In re John Doe Proceeding, 2003 WI 30, ¶ 54, 260 Wis. 2d 653, 660 N.W.2d 260 ("A John Doe judge is also entitled to exercise the authority inherent in his or her judicial office."); State v. Cummings, 199 Wis. 2d 721, 736, 546 N.W.2d 406 (1996) ("A grant of jurisdiction by its very nature includes those powers necessary to fulfill the jurisdictional mandate.").
Although the legislature created John Doe proceedings, the separation of powers doctrine bars the legislature from *252 "unduly burdening," "materially impairing," or "substantially interfering" with the inherent powers of the judicial branch, including the inherent powers of the John Doe judge in the instant cases. See State v. Holmes, 106 Wis. 2d 31, 68-69, 315 N.W.2d 703 (1982). See also majority op., ¶ 127, and Justice Prosser's concurrence, ¶¶ 208-210, 216, 239, both of which improperly allow the legislature to trump the inherent judicial powers of the John Doe judge.

 Whether the Special Prosecutor is deprived of competency on account of a procedural defect in his appointment turns on whether the defect was "central" to the purpose of Wis. Stat. § 978.045(lr) (setting forth conditions for the appointment of a special prosecutor). The court of appeals determined in In re Commitment of Bollig, 222 Wis. 2d 558, 571, 587 N.W.2d 908 (Ct. App. 1998), that the purpose of § 978.045(1r) is to control costs, as the State pays an appointed special prosecutor for work that would ordinarily be performed by a district attorney. It seems implausible to suggest that the costs the State has incurred on account of a single special prosecutor's appointment are substantial enough to render the alleged defect in the Special Prosecutor's appointment central to the cost-controlling objective of § 978.045(1r).

 See majority op., ¶¶ 108-113.

 All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

 In campaign-finance terminology, "issue advocacy" is generally understood to mean speech about public issues, whereas "express advocacy" refers to campaign or election-related speech. Fed. Election Comm'n v. Wis. Right to Life, Inc., 551 U.S. 449, 456 (2007).

 "A John Doe proceeding is intended as an independent, investigatory tool used to ascertain whether a crime has been committed and if so, by whom." In re John Doe Proceeding, 2003 WI 30, ¶ 22, 260 Wis. 2d 653, 660 N.W.2d 260. A John Doe proceeding, by virtue of its secrecy, serves as an essential investigative device that protects " 'innocent citizens from frivolous and groundless prosecutions.1" Id. (citation omitted).

 It is noteworthy that the United States Supreme Court denied certiorari review in O'Keefe v. Chisholm, 769 F.3d 936 (7th Cir. 2014) cert. denied, No. 14-872, 2015 WL 260296 (U.S. May 18, 2015), a case in which the United States Court of Appeals for the Seventh Circuit determined that the Supreme Court has not decided whether the First Amendment prohibits the regulation of coordinated issue advocacy between a candidate or campaign committee and an issue advocacy group. If the Supreme Court eventually determines that the First Amendment allows that type of regulation, the decision would validate the special prosecutor's in-kind contribution argument. As discussed below, it can be argued that Williams-Yulee v. Florida Bar, 135 S. Ct. 1656 (2015), supports the special prosecutor's position, but that decision, while helpful, is certainly not definitive on the issue.

 Wisconsin Stat. § 11.06(1) provides, in relevant part: "Except as provided in subs. (2), (3) and (3m) and ss. 11.05(2r) and 11.19(2), each registrant under s. 11.05 shall make full reports ... of all contributions received, contributions or disbursements made, and obligations incurred." (emphasis added).

 Majority op., ¶ 62.

 Majority op., ¶ 67.

 Majority op., ¶ 66.

 Majority op., ¶ 67.

 See majority op., ¶¶ 62, 67.

 Majority op., f 69.

 While I disagree with the majority's dismissal of the special prosecutor's in-kind contribution argument, I do agree with the majority's criticism of some of the purported tactics used in gathering evidence in this particular John Doe investigation. As the majority identifies, some of these methods *345 certainly appear to be improper and open to severe disagreement. See majority op., ¶¶ 28-29. At this point, the actual facts concerning the tactics used have not been fully established, but the allegations are very troubling.

 O'Keefe, 769 F.3d at 942.

 Wis. Stat. § 11.01(15) defines a "personal campaign committee" as:
A committee which is formed or operating for the purpose of influencing the election or reelection of a candidate, which acts with the cooperation of or upon consultation with the candidate or the candidate's agent or which is operating in concert with or pursuant to the authorization, request or suggestion of the candidate or the candidate's agent.

 To be clear, the special prosecutor's main focus in this investigation is on certain campaign committees' failure to report receipt of in-kind contributions (in the form of coordinated spending on issue advocacy), not on certain issue advocacy groups' failure to report making such in-kind contributions. So what the majority mistakenly refers to as "illegal *348 campaign coordination" is in reality a campaign committee's failure to report its receipt of an in-kind contribution.

 Chapter 11 imposes registration requirements on political speakers such as candidates, their campaign committees, political committees, independent groups, and individuals. See Wis. Stat. § 11.05.

 The intentional failure to disclose contributions received is a violation of criminal law. See Wis. Stat. §§ 11.27(1) and 11.61(l)(b).

 It is worth noting that Buckley found no overbreadth or vagueness concerns with respect to FECA's definition of "contribution" even though that definition included "expenditures placed in cooperation with or with the consent of a candidate, *357 his agents, or an authorized committee of the candidate." Buckley v. Valeo, 424 U.S. 1, 78 (1976).

 This court previously examined Buckley for the purpose of clarifying the meaning of the term "express advocacy" as used in Wis. Stat. § 11.01(16). See Elections Bd. of State of Wis. v. Wis. Mfrs. & Commerce, 227 Wis. 2d 650, 597 N.W.2d 721 (1999) (WMC). In WMC, a Wisconsin corporation sought and received assurance from the Elections Board of the State of Wisconsin (the Board) that certain advertisements it wanted to broadcast prior to a general election did not qualify as express advocacy. Id. at 653, 677 n.24. The Board later determined that the ads that were broadcast constituted express advocacy under a context-based approach toward defining the term. Id. at 678-79.
We turned to Buckley to decide whether the corporation had fair warning that its ads constituted express advocacy, ultimately concluding that it did not. Id. at 662-81. As part of our discussion, we recognized that the United States Supreme Court created the express advocacy limitation in Buckley to avoid overbreadth and vagueness concerns with respect to FECA's regulation of independent expenditures. See id. at 664-66. So it would be a mistake to rely on WMC for the proposition that the express advocacy limitation is necessary *358 to cure constitutional infirmities with respect to Chapter ll's regulation of campaign contributions received. See majority op., ¶ 68 n. 23.

 The term "electioneering communication" was defined to encompass "any broadcast, cable, or satellite communication" that "refers to a clearly identified candidate for Federal office" and appears within 60 days of a federal general election or 30 *359 days of a federal primary election. McConnell v. Fed. Election Comm'n, 540 U.S. 93, 189 (2003) overruled on other grounds by Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010).

 The majority states that "Although Borland II did not involve an allegation of coordination, that distinction is meaningless in determining whether the definition of 'political purposes' is vague or overbroad." Majority op., ¶ 67 n.22. Actually, it makes all the difference. Under Chapter 11, coordinated disbursements are treated as contributions.

 For a thorough discussion that supports my interpretation of Buckley's distinction between contributions and independent expenditures, see generally Brent Ferguson, Beyond *362 Coordination: Defining Indirect Campaign Contributions for the Super PAC Era, 42 Hastings Const. L.Q. 471 (2015).

 Wisconsin Stat. § 11.06(1) includes the term "obligation" as well. Under Chapter 11, "incurred obligation" is defined as "every express obligation to make any contribution or disbursement ... for political purposes." Wis. Stat. § 11.01(11). Since that term relies on a promise to make a "contribution" or "disbursement," it is unnecessary to separately analyze it.

 Majority op., ¶ 48.

 See majority op., ¶ 74.

 See majority op., f ¶ 66-67.

 Majority op., ¶ 67.

 Majority op., ¶¶ 66-67.

 Speech that is protected under the First Amendment is not necessarily immune to governmental regulation. See Williams-Yulee, 135 S. Ct. at 1667 ("[Nlobody argues that solicitation of campaign funds by judicial candidates is a category of unprotected speech. As explained above, the First Amendment fully applies to Yulee's speech. The question is instead whether that Amendment permits the particular regulation of speech at issue here."). This point appears lost on the majority. See, e.g., majority op., f ¶ 66-67.

 See majority op., ¶¶ 78, 101.